**UNITED STATES of America,
Plaintiff-Appellee,**

. v.

**James T. WILLIAMS,
Defendant-Appellant.**

**No. 80–5268.**

United States Court of Appeals,
Sixth Circuit.

Argued April 15, 1981.

Decided Nov. 30, 1981.

Ivan E. Barris, David F. DuMouchel, Detroit, Mich. for defendant-appellant.

John L. Smith, U. S. Atty., C. Fred Partin, Asst. U. S. Atty., Louisville, Ky., Mervyn Hamburg, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before MERRITT, BROWN and JONES, Circuit Judges.

BAILEY BROWN, Circuit Judge.

James T. Williams appeals a jury conviction for causing the interstate transportation of a motor vehicle, knowing that it was stolen, and receiving and concealing the same, in violation of 18 U.S.C. §§ 2312 and 2313. Because (1) testimony during the government's case-in-chief and during his cross-examination that Williams did not answer certain questions during an investigatory interrogation violates his Fifth Amendment privilege against self-incrimination and right to due process of law; and (2) a jury instruction that "in the eyes of the law, a man is held to intend the natural consequences which flow from his own acts" violates Fifth Amendment due process, we reverse the judgment of the district court.

## FACTS

On July 7, 1977, a new white Ford tandem tractor was delivered from the Ford Motor Company to a truck dealership in Detroit, Michigan. On July 11, the truck was reported stolen. In early April 1979, Williams, the owner of Williams Equipment Company, a truck rebuilding business located in LaCenter, Kentucky, sent employee Alvan Bailey to Michigan to bring back a truck that he had purchased. Williams instructed Bailey to register at a motel near Ypsilanti, Michigan. He provided Bailey with a suitcase that contained license plate 9LC840 registered to a 1966 Ford truck owned by Williams' business, a registration document, Williams Equipment Company decals and a sealed envelope. Williams told his foreman that he (Williams) "could stand to lose eight thousand dollars" if the suitcase were lost. Bailey was instructed that on arrival at the motel he was to telephone Fred Harper to report his arrival, and to await further instructions from Harper.

As instructed by Williams, Bailey went to the motel on the afternoon of April 7, 1979. He telephoned Harper. Harper told Bailey that he would come to the motel that evening and in the meanwhile would send someone to pick up the license plate and related materials. That afternoon an individual met Bailey at the motel. Bailey gave that individual the license plate, registration documents, and the Williams Equipment Company decals. At 7:30 p. m. Harper met Bailey at the motel. Bailey gave Harper the sealed envelope. Harper took Bailey to a truck stop-service station located near the motel. Parked on the premises of the truck stop was a white Ford truck bearing the license plate and Williams Equipment Company decals that Bailey had brought from Kentucky. Fictitious registration documents brought by Bailey and the ignition keys were inside the truck. Bailey drove the truck back to LaCenter, Kentucky.

Williams used the truck for business purposes. It continued to bear the license plate issued to a 1966 Ford. Williams' foreman made some minor modifications to the truck.

Contemporaneous with Bailey's transporting the truck from Michigan to Kentucky, a confidential informant advised FBI agent L. V. McGinty that Bailey would return from Michigan with a relatively new truck. In mid-April, Kentucky State Detective Paul Lane told the FBI that Williams was in possession of a stolen truck. The FBI and the State Police began an investigation. Lane and McGinty made separate visits to Williams Equipment Company on two or three occasions in search of a new Ford truck. On May 8, 1979, a white Ford truck bearing the license plate number 9LC840 was located at Williams Equipment Company. County and state vehicle registration records revealed that license number 9LC840 had been registered to a 1966 Ford truck. Because the Ford truck seen at Williams Equipment Company appeared to be a later model than 1966, the FBI intensified its investigation.

On May 16, 1979, Lane saw the truck in question parked partly on the street and partly on Williams Equipment Company's property adjacent to the street. Lane instructed Williams' foreman not to move the vehicle. Lane notified McGinty. Upon McGinty's arriving at the scene, McGinty advised Williams of his rights to silence and

counsel. Williams, seated in McGinty's car, though acknowledging his awareness of his constitutional rights, refused to sign a waiver. Williams agreed, however, to talk to McGinty. Williams stated that he had met an unnamed individual while visiting friends in Fort Wayne, Indiana in February 1979, who knew of his interest in purchasing a used Ford truck. The unnamed person indicated that he had such a truck available for sale and quoted an acceptable price. Williams further stated that he sent Bailey to Michigan to obtain the truck. Williams admitted to changing the truck's hood, lengthening its frame, adding an axle and replacing the tires. He also admitted operating the truck with an improper license plate. However, Williams refused to disclose how much he paid for the truck or the manner of payment.

Williams then permitted McGinty to inspect the truck. The vehicle identification plate had been removed from its customary location by the use of a drill. A vehicle identification plate affixed to the door bore a number different from the number on the registration documents. Additionally, the effective date of the dealer's warranty period had been scratched off that plate beyond recognition. Based upon these observations, McGinty impounded the truck.

### I

### Proof of Williams' Partial Silence on Interrogation

■ The government developed on examination of the FBI agent during its case-in-chief that, after *Miranda* warnings and Williams' indication of willingness to talk, Williams answered some questions but then refused to say how much and in what manner he paid for the vehicle and from whom he purchased it. The record reflects, however, that this testimony by the agent was without objection and, indeed, it appears that defense counsel had been supplied a copy of the agent's report of interview before the trial so that, it would appear, the

testimony came as no surprise to defense counsel. Thus, if we are to find reversible error based on this examination during the government's case-in-chief, we must find plain error, Rule 52(b), Fed.R.Cr.P., that is, it was both obvious and substantial. 3 Wright's Fed.Prac. and Proc. § 856 (1969).

It was plain error in that it clearly violated Williams' Fifth Amendment privilege against self-incrimination when the FBI agent was examined as to Williams' refusal to answer these questions. *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1624–25 n. 37, 16 L.Ed.2d 694 (1966). *See also, e. g., Grieco v. Hall*, 641 F.2d 1029, 1034 (1st Cir. 1981) (*Miranda* protects refusal to answer specific questions); *United States v. Ghiz*, 491 F.2d 599, 600 (4th Cir. 1974) (same).

After Williams took the stand, the prosecutor questioned him about, and bore in on, his refusal to tell the FBI agent how much and in what manner he paid for the vehicle and from whom he purchased it. At this point, Williams' counsel, at a conference at the bench, unsuccessfully requested the trial judge to instruct the jury that his refusal to answer these questions at the interview was not evidence of his guilt or innocence. While this formulation was unartful in raising the objection that the cross-examination was improper for all purposes including impeachment purposes, it fairly brought this question to the attention of the trial court. In any case, we conclude that the admission of this cross-examination was plain error under Rule 52(b).

It was a violation of Williams' due process rights under the Fifth Amendment when he was cross-examined about his failure to answer these questions. This is true even if the cross-examination were limited to purposes of impeachment. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The rationale of *Doyle* is that it is fundamentally unfair, except in special circumstances not present here,* to cross-

---

\* For example, such inquiry is permissible where a defendant has testified to an exculpatory version of the events and has claimed that he gave

the same story when he was interrogated; it is also permissible where the defendant has testi-

examine a defendant about post-*Miranda* silence because the *Miranda* warning implicitly assures that silence will carry no penalty and also because silence after such a warning is "insolubly ambiguous." *Doyle*, 426 U.S. at 617–18, 96 S.Ct. at 2244–45.

## II

### Instructions to the Jury

 In that part of the charge dealing with proof of knowledge, intent or willfulness, the trial court charged the jury, without objection, that "in the eyes of the law, a man is held to intend the natural consequences which flow from his own acts."

This instruction was plain error under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), which was decided several months before this case was tried, in that the instruction clearly constituted a denial of due process guaranteed by the Fifth Amendment. Moreover, this court in *United States v. Reeves*, 594 F.2d 536 (6th Cir. 1979) and in *United States v. Gaines*, 594 F.2d 541 (6th Cir. 1979), which likewise were decided well before the instant case was tried, again made it clear that an instruction such as this is erroneous. This particular instruction, indeed, is subject to an interpretation by a jury that an irrebuttable presumption is created.

The government appears to contend that this charge to the jury could have been considered by the jury only in connection with other elements of the crime and could not have been considered on the issue as to Williams' guilty knowledge. Since, the government contends, the other elements of the crime were really not in dispute, the charge was harmless error. However, we simply cannot tell whether this charge was applied by the jury in making its determination that Williams had guilty knowledge. See *Sandstrom*, 442 U.S. 525–526, 99 S.Ct. 2460.

## III

### Harmless Error

The most difficult question raised here is whether these constitutional errors were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The district court, in making remarks to the jury after the verdict, stated that in view of his business background and of the facts he admitted, Williams' testimony that he did not know the vehicle was stolen "was an insult to your intelligence and an insult to the dignity of this court and the United States." We can almost agree but not quite, and therefore we cannot say that these errors were harmless beyond a reasonable doubt.

The judgment of the district court is vacated and the case is remanded.

fied that he cooperated fully from the beginning.  *Grieco, supra*, at 1034.