Christopher Eric GRAVLEY,
Petitioner–Appellant,

v.

David MILLS, Warden, Morgan County
Regional Correctional Facility,
Respondent–Appellee.

No. 95–5498.

United States Court of Appeals,
Sixth Circuit.

Argued March 12, 1996.

Decided June 25, 1996.

---

Charles W. B. Fels (argued and briefed), Ritchie, Fels & Dillard, Knoxville, TN, for Petitioner–Appellant.

Amy L. Tarkington, Asst. Atty. Gen. (argued and briefed), Office of the Attorney General, Criminal Justice Div., Nashville, TN, for Respondent–Appellee.

Before: KEITH, MARTIN, and NELSON, Circuit Judges.

KEITH, J., delivered the opinion of the court, in which MARTIN, J., joined. NELSON, J. (pp. 790–795), delivered a separate dissenting opinion.

KEITH, Circuit Judge.

Petitioner, Christopher Eric Gravley, appeals from the district court's denial of his petition for a writ of habeas corpus. Gravley contends that during the course of his trial in Tennessee state court, the prosecution made improper references to Gravley's post-*Miranda* silence in violation of the Constitution. Upon review of the record, we agree and hereby **REVERSE** the district court's holding and grant the habeas corpus petition.

## BACKGROUND

We are all aware of the immense power and influence a state prosecutor wields when he or she brings a case against an accused. Usually, this power is tempered by safeguards that prohibit the state from violating an accused's constitutional rights. The goal is to attain a fair trial where the accused will be presumed innocent in the eyes of the jury until proven guilty beyond a reasonable doubt by the state. However, regrettably, in some instances a prosecutor abuses his or her power and in so doing, diverges from the goal of seeking truth and justice. This case presents an example of such an instance: One where the prosecutor, in his zest to ensure a conviction, made constitutionally impermissible references before the jury regarding an accused's silence after his arrest.

On Saturday, September 22, 1984, Jane Marie Guili and Lucy Tinsley attended a party in Knoxville, Tennessee, at the fraternity house of her ex-boyfriend, Thomas Enders. Enders and Guili had been together for three years previously but had recently decided to date other people. According to Tinsley's testimony, Guili and Tinsley left Tinsley's apartment around 9:00 p.m. to attend the party. When they arrived, Guili saw Enders in the company of another woman.

While at the party, Guili borrowed Enders' car keys and made a trip to a local convenience store. When she left the party around 1:30 a.m., she did not place the keys in the fraternity house mailbox as Enders had instructed, but instead took them with her to Tinsley's apartment.

Enders found that the keys had not been left in the mailbox at approximately 3:30 a.m. and phoned Guili to get directions to Tinsley's apartment. After the call from Enders, Tinsley, who had stayed up talking to Guili in the living room, went to bed. Guili testified that she stayed in the living room with the light off, listening to the radio and waiting for Enders. Another student, Tommy Gray, was also asleep in one of the three adjoining bedrooms.

Guili testified that sometime after the phone call she heard a knock on the door. She claimed that since she was expecting Enders, she opened the door without looking through the peephole. After opening the door, Guili asserted that a man, wearing a stocking cap over his head, pushed his way into the apartment and closed the door behind him. The assailant did not lock the door.

Guili testified that the assailant held a knife and told her that he would kill her if she did not obey his orders. She stated he told her to sit on the floor while he held a knife against her throat and fondled her. At some point, the phone rang. Guili testified that the assailant told her not to answer it, but that she convinced him to permit her to do so because other people were staying in the apartment who would come into the front room if she did not answer. When she answered the phone, Enders was on the other end and told her he could not find the apartment. Guili testified that she tried, without alerting the assailant, to indicate to Enders that something was wrong.

Guili testified that after she hung up, the intruder pulled down his pants. However, he was soon interrupted by another phone call.

Again Guili was allowed to answer the phone and this time the caller was Eric Stiles, a friend of Enders. Before the call ended, Enders again spoke to Guili. Enders testified that he was disturbed by the conversations with Guili and told her that he was going to call the police. However, instead of calling the police, Enders called a female friend who knew where Guili was staying and arranged to be driven there. Guili testified that after the last call ended the assailant told her to lie on the floor, leaned over, pushed his pelvis towards her and penetrated her.

Soon thereafter, Enders along with several of his friends arrived at the apartment complex. When they got to the apartment complex, Enders and his cousin, Jeff McEvoy, went to Tinsley's apartment while the others stayed in the car. Reaching the apartment, Enders turned the doorknob and walked in. Enders testified that as he entered the apartment he saw Gravley with his pants off lying on the floor with Guili. McEvoy testified that as he entered the apartment, he saw Gravley on his knees with his pants down but his briefs on. Enders began yelling at Gravley. According to Enders, he heard Gravley say, "its not my fault," before getting to his feet and racing out of the apartment. McEvoy and Enders followed. McEvoy testified that Gravley fell at the bottom of the stairs, got back up, and ran away. Enders and McEvoy did not pursue but went back to the apartment to check on Guili.

Enders testified that Guili told him that she had been raped, and that a pair of pantyhose that were lying on the apartment floor had belonged to the assailant. She also told Enders that the assailant had possessed a knife. Enders testified that he then found a knife on the living room floor near where the pantyhose had been lying.

McEvoy testified that soon after this, he left the apartment and saw Gravley peeking around the corner of a building. McEvoy chased Gravley and eventually caught him at the trash containers for the apartment complex. By this time, Tommy Gray, who had previously been sleeping in one of the bedrooms, was also present. After the police took Guili and Enders to the trash contain-

ers, Enders identified Gravley by sight and Guili identified him by sound.

Detective Gary Moyers testified that upon arriving at the apartment, Guili and Enders pointed out the pantyhose and steak knife that Guili said belonged to her assailant. Moyers further testified that on the morning of Gravley's arrest, he informed him of his *Miranda* rights and Gravley signed a rights waiver. Thereupon, he gave an oral statement to Moyers in which he claimed that he had never seen Guili before she identified him. Four days later, Moyers tried to interview Gravley a second time. Once again he advised Gravley of his right to remain silent. This time, Gravley declined to speak to Moyers or to sign a rights waiver. Later, a preliminary hearing was conducted in Knox County General Sessions Court, at which Gravley was present but did not testify. He also later attended a state probation revocation hearing, but did not testify.

On the night of the alleged assault, Moyers accompanied Guili to a hospital, where she was examined by a physician. There was no physical evidence of "bruises or cuts or anything of that nature." The doctor also observed "a tampon in place" with the string "evident," and blood in the tampon. The doctor stated that he had "understood" that the tampon in place during the examination was not the same tampon Guili was wearing at the time of the alleged incident. The doctor also stated that no emissions were found.

A technician with the Knoxville Police Department took custody of the knife and pantyhose. He also took samples of Gravley's head and pubic hair and sent them to the FBI along with a rape kit, which included Guili's hair samples, Gravley's underwear, and the pantyhose he had received from Detective Moyers. The FBI test results showed no evidence of blood in Gravley's genital area. An examination of the pantyhose revealed no hairs like Gravley's. The knife, which was described as a "slick, smooth object," did not bear Gravley's fingerprints.

On February 28, 1985, the Knox County Grand Jury returned an indictment charging

Gravley with burglary and aggravated rape. Gravley was tried in Knox County Criminal Court. Prior to the trial's commencement, Gravley's counsel became ill and had to seek medical attention. This resulted in the trial being postponed for six days. The delay was accompanied by a scheduling conflict which precluded counsel's law partner from participating in the trial. As a result, Gravley's attorney was forced to try the case alone without anyone to assist her in keeping track of objections and court rulings. She asserted that she made trial notes herself but that these notes, upon examination after trial, proved useless.

At trial, Gravley testified, in contrast to his prior statement that he had never seen Guili before she identified him, that he and Guili had engaged in consensual sex acts, but not intercourse. Gravley claimed he had met Guili the previous evening in the parking lot at approximately 10:00 p.m. and that she had invited him to come up later and had willingly admitted him into the apartment. He claimed that he had not told Detective Moyers this initially because he was tired, scared and hung over.

On November 19, 1985, the jury, after a two-day trial, found Gravley guilty of burglary and aggravated rape. Immediately after the trial, counsel entered the hospital for major surgery. She was in the hospital approximately five days. Her surgery was performed under general anesthesia and required her to take a combination of Demerol and Valium. Upon release from the hospital, her physician prescribed Percodan and Darvocet as pain killers, and she was taking these pain killers while preparing Gravley's motion for a new trial. She later testified that reconstructing the trial from memory was extremely difficult due to the passage of time, the severity of the intervening surgery and accompanying medication, and the minimal notes taken at trial.

On December 13, 1985, the trial court denied Gravley's motion for a new trial and sentenced him to concurrent penitentiary sentences of 15 years for burglary and 50 years for aggravated rape.

On January 6, 1987, the Court of Criminal Appeals affirmed Gravley's convictions.

Gravley filed a petition for rehearing, which was denied on February 12, 1987. He then filed an application for permission to appeal to the Tennessee Supreme Court, which was denied on May 11, 1987.

On September 25, 1987, Gravley filed a petition for post-conviction relief. The trial judge dismissed this petition on November 4, 1988, and the Court of Criminal Appeals issued an opinion affirming this decision on March 6, 1990. Gravley then filed an application for permission to appeal to the Tennessee Supreme Court, which was denied on July 2, 1990.

Gravley filed his petition for writ of habeas corpus in federal district court on May 29, 1991. On December 2, 1994, a magistrate judge issued a report and recommendation concluding that Gravley's action should be dismissed. On February 7, 1995, the district court entered an order and memorandum opinion denying the petition for writ of habeas corpus.

Thereafter, after being granted an extension of time, Gravley filed his notice of appeal on April 6, 1995.

## DISCUSSION

### A. Ineffective Assistance of Counsel

Gravley contends that he should be afforded a new trial because of prosecutorial misconduct that amounted to constitutional error. However, a preliminary issue, which we must address, is whether Gravley's cause of action is procedurally barred from being addressed by this Court.

In *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court concluded that a state's determination that a procedural default foreclosed relief in the state system constituted an adequate and independent state ground for the decision so as to foreclose review of any federal constitutional claims. Accordingly, a federal habeas corpus petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review "absent a showing of cause for non-compliance and some showing of actual

prejudice resulting from the alleged constitutional violation." *Id.* at 84, 97 S.Ct. at 2505.

In this case, Gravley has failed to comply with the state of Tennessee's rules of procedure for preserving his constitutional claim of prosecutorial misconduct. However, we find that his claim can still be addressed by this Court because there was "cause" for the default and a resulting "prejudice" from the omission.[1]

The Supreme Court has noted that "cause" under the cause and prejudice test must be something external to the petitioner, something that "cannot fairly be attributed to him." *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991). Attorney error that amounts to ineffective assistance of counsel can constitute such "cause." *Id.* at 753–54, 111 S.Ct. at 2566–67.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set out a two pronged test for establishing ineffective assistance of counsel. The Court stated,

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064. It is clear that *Strickland* requires a defendant to show that

his trial counsel's performance was not within a "wide range of reasonable professional assistance" and that but for counsel's performance, the result probably would have been different. *Id.* at 689, 694, 104 S.Ct. at 2065, 2068; *see also United States v. Morrow,* 977 F.2d 222, 229 (6th Cir.1992) (en banc), *cert. denied,* 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993). In this case, the district court determined that Gravley did not have a valid ineffective assistance of counsel claim. This Court reviews the district court's determination de novo. *Blackburn v. Foltz,* 828 F.2d 1177, 1181 (6th Cir.1987), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988).

The most compelling evidence of counsel's incompetence was her failure to object to very serious instances of prosecutorial misconduct. During the course of the trial, Gravley's counsel failed to object to, *inter alia:* (1) the initial introduction of Gravley's silence at his second interrogation; (2) Gravley's probation revocation hearing transcript, which dealt with an otherwise unrelated conviction for negligent vehicular homicide, being introduced as an exhibit; (3) the state's cross-examination of Gravley about his post-arrest silence at his probation revocation hearing; (4) an erroneous jury instruction sought by the state that told the jury that it could consider Gravley's prior criminal record to explain what had taken place at trial; and (5) the state's final argument which invited the jury to consider constitutionally protected silence as evidence of Gravley's guilt and recent fabrication. Counsel's failure to recognize that the prosecution was continually making improper comments

---

1. The district court determined that Gravley's constitutional claim could be addressed without doing a "cause" and "prejudice" analysis because the last state court to hear the case had not dismissed the action on an independent state ground. *See Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) (holding that a state procedural default will not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment clearly and expressly stated that its judgment rested on a state procedural bar). The Tennessee Attorney General argues that this finding was erroneous. The Attorney General claims that the Tennessee Criminal Court of Appeals'

statement that "[w]e are satisfied that had these issues been properly preserved the end result would have been the same" was a clear and express statement that Gravley was procedurally barred from bringing his claim in state court. The district court concluded that this statement was not specific enough to bar federal review. On appeal, this Court does not have to interpret the clarity of the Tennessee Court's language because we find that regardless of whether there was a procedural default—*i.e.,* the above-language was definite enough to bar federal review—there was sufficient "cause" and "prejudice" to hear the case.

concerning Gravley's post-arrest silence was a critical error, especially since Gravley's credibility was such an important issue in the case.

These mistakes at trial were exacerbated after the trial when counsel failed to preserve any of the egregious errors committed by the prosecution for appeal. Indeed, in her motion for a new trial counsel failed to even discuss the one objection, in response to the prosecutor questioning Gravley about his silence at his preliminary hearing, that she had made at trial. Counsel did not review the motion for a new trial with Mr. Gravley or obtain an explicit rights waiver from him. Clearly, Gravley had a strong Fourteenth Amendment argument on appeal, due to the prosecution's egregious misconduct. However, this argument was not raised in the motion for a new trial and we can discern no reason, other than negligence, for its omission.

Indeed, counsel admitted after trial that she was unaware she was waiving any rights and did not intend to do so. *See, Hockenbury v. Sowders,* 718 F.2d 155, 160 (6th Cir.1983), *cert. denied* 466 U.S. 975, 104 S.Ct. 2354, 80 L.Ed.2d 826 (1984) (noting "Sixth Circuit has found 'cause' to exist for a procedural default where defense counsel's failure to object was due to an admission of lack of knowledge of a known rule of law by a controlling court"); *Rachel v. Bordenkircher,* 590 F.2d 200, 204 (6th Cir.1978) (concluding that defense counsel's inexperience and lack of knowledge are factors that can constitute "cause" under *Wainwright*). She now feels her representation of Gravley in preparing his motion for a new trial was ineffective assistance of counsel.

In all fairness to Gravley's counsel, many of her mistakes may have been attributed to her medication. At the very least her illness had to have been a major distraction to her during her representation of Gravley. However, regardless of whether counsel's ineffectiveness was caused by illness, ignorance or inadvertence—there can be no question that counsel was deficient.

Next, we must consider whether Gravley was prejudiced by his counsel's errors. Counsel's ineffectiveness at trial allowed the prosecutor to continually imply to the jury that Gravley's failure to assert his story earlier, even though he had a constitutionally protected right to remain silent at those earlier moments, was evidence of his guilt. The influence that such improper assertions could have had on the jury are immense. We simply cannot be certain that the jury was not adversely affected from the prejudicial comments it was allowed to hear over and over again. *See Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). As a result, there is cause and prejudice to hear Gravley's constitutional claims.

## B. Doyle *Error*

■ Gravley asserts he was denied a fair trial because of the prosecutor's egregious acts of misconduct. After a review of the record we agree that Gravley was not afforded a fair trial on account of the state prosecutor's repeated references to Gravley's post-arrest silence.

■ In *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2246, 49 L.Ed.2d 91 (1976), the Supreme Court held that it was a violation of the due process clause of the Fourteenth Amendment for the prosecution to use a defendant's post-arrest silence to impeach exculpatory testimony given by him at trial. This rule rested on the presumption that it was fundamentally unfair to assure a suspect that his silence would not be used against him and then to use his silence to impeach an explanation subsequently offered at trial. *Wainwright v. Greenfield,* 474 U.S. 284, 291, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986). However,

Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of

his statements, the defendant has not remained silent at all.

*Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (per curiam); *see also, Sowders,* 718 F.2d at 160 (concluding no *Doyle* error, where the prosecutor questioned petitioner about the difference between his trial testimony and prior inconsistent statements he had made after his arrest).

In this case, Gravley did make a prior inconsistent statement to his testimony at trial. However, the prosecutor's cross-examination of Gravley went far beyond calling the jury's attention to this inconsistency. Instead, the prosecutor, time and time again, made references to the fact that Gravley had remained silent on various occasions after his arrest. The prosecutor's clear intent was to persuade the jury that if Gravley's trial testimony had indeed been true, he would have come forward earlier with his story.

The prosecutor first erred when he introduced into the state's case in chief, prior to any testimony from Gravley, substantive evidence that Gravley chose to remain silent on the second occasion that he was interrogated by the police. This occurred after Gravley had already been expressly advised that he had a right to remain silent and had chosen to rely on that advice. The prosecutor's egregious conduct then continued when he cross-examined Gravley:

[Assistant DA] Q: Now you again had the opportunity to talk to Detective Moyers on the 26th; is that correct?

[Gravley] A: Yes, sir.

Q: And he advised you of your rights again; is that correct?

A: That's correct.

Q: And you at that time chose not to talk to Detective Moyers, didn't you?

A: Yes, sir.

Q: So, again, you had ample opportunity to tell him what had occurred; is that correct?

A: Yes sir.

Q: And this case occurred a little over a year ago; is that correct?

A: Yes. Fourteen months ago, to be exact, I guess. Somewhere in there.

Q: And you have had a preliminary hearing; is that correct?

A: About a week after the incident—the alleged incident.

Q: You chose not to tell what occurred there?

. . .

[Gravley's Counsel]: Your Honor, I object to that. I don't think that's proper cross. It's a legal proceeding. He was advised by a lawyer. There is no indication of why he chose, or did, or whether he chose to.

[Assistant DA]: Your Honor, he can respond to the question. There is nothing wrong with the asking of the question.

[Gravley's Counsel]: I still think it is improper, Your Honor. I will go with your ruling.

[Court]: All right. Overruled.

Q: You had the opportunity to tell what occurred at the preliminary hearing, did you not?

A: I—I don't remember having an opportunity. I just remember my lawyer, the one that was representing me at the time, advised me not to say or talk about anything.

Q: And then you were taken back to McMinn County: is that correct?

A: Several months thereafter.

Q: And you had a probation hearing there: is that correct?

A: Yes, sir.

Q: And at that probation hearing in McMinn County, the testimony that was responsible for the revocation of your probation was Ms. Guili's testimony, is that correct?

A: Yes, sir.

Q: And you had an opportunity to testify there and tell Judge Bebb what had occurred?

A: No—

Q: Pardon?

A: I had—my—the lawyer representing me there, my attorney that represented me at the time, did—didn't advise me not to either say or testify about anything. That was not even discussed. My testifying there.

Q: When you relied on your lawyers—
A: Of course.
Q: What he advised you?
A: Of course.
Q: And as a result of that, your probation was revoked?
A: Yes, sir.
Q: So, you have had numerous opportunities to testify at numerous proceedings and to give information to the Police Department about what occurred that night; is that correct?
A: That's correct.
Q: And, yet, you have chosen not to do so: is that correct?
A: Yes, sir; yes, sir. Tr. 334–37.

The prosecutor then returned to the subject of Gravley's post-*Miranda* silence in his final argument. The prosecutor stated,

> You have heard Mr. Gravley testify that today, this very day, is the very first time he has ever told you—or told anyone—the truth about what happened. And consider that, also, according to his testimony, that on at least two occasions, the preliminary hearing and the probation revocation hearing, he has had the opportunity to hear exactly what this young lady issaying before he ever has to decide on what story he is going to use.

From the beginning of its own case, through the cross examination of the defendant, up until the culmination of its final argument, the state consistently and repeatedly sought to make impermissible references to Gravley's silence after his arrest. *See United States v. Williams,* 665 F.2d 107, 110 (6th Cir.1981) (concluding that "it is fundamentally unfair, except in special circumstances ... to cross-examine a defendant about post-*Miranda* silence").

■ The goal of *Doyle* is to prevent a jury from drawing inferences of guilt from a

defendant's decision to remain silent after his or her arrest. *See Smith v. Cadagin,* 902 F.2d 553, 557 at n. 4 (7th Cir.), *cert. denied,* 498 U.S. 865, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990) (*Doyle* is intended to prohibit a prosecutor from exploiting a defendant's post-arrest silence). An accused has a constitutionally protected right to remain silent at those times and such silence is not evidence of guilt. The burden always remains on the state to prove guilt beyond a reasonable doubt.

■ In this case, the prosecutor insinuated to the jury that Gravley's silence at his preliminary and probation revocation hearings was an inference of his guilt. The prosecutor did this not before, but after Gravley had testified that he had remained silent at those times on advice of counsel. There can be no excuse for the prosecutor's egregious conduct. Gravley had already admitted, on direct examination, that he had given a false statement to Officer Moyers initially.[2] Moreover, the prosecution could have made permissible references to inconsistencies in Gravley's statements, *see, e.g., Anderson,* 447 U.S. at 408, 100 S.Ct. at 2182, *Sowders,* 718 F.2d at 159–60, by simply questioning Gravley, as the prosecutor later did, on why he initially gave a different statement to the police than the testimony he was providing at trial.[3] In short, Gravley's credibility could have been placed in doubt without improper references to his post-*Miranda* silence.

■ However, by repeatedly driving home references to Gravley's silence and implying that such silence was evidence that Gravley was lying, the prosecutor crossed the line. As Supreme Court Justice Sutherland stated in the often cited case of *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935),

---

**2.** When Gravley's counsel asked him to take a look at the statement he gave to Officer Moyers, Gravley responded that the statement was false and that he had lied to Moyers because he was scared and hung over and thought it was in his best interest to deny the entire encounter. Tr. at 327.

**3.** After the prosecutor made improper references to Gravley's silence at his probation revocation

hearing and preliminary hearing, he questioned Gravley about a specific discrepancy between his testimony at trial and his statement to detective Moyers following his arrest, Gravley responded "[t]hat is untrue, but that's what I put on this— what I said to him at the time he was asking me, sir. I've done told you that I gave a false statement."

[A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

The prosecutor's conduct in this case was a "foul" blow that amounted to blatant and egregious *Doyle* error.

### C. Substantial Influence on the Jury

 Having established *Doyle* error, the next question is whether a new trial is required. For not every constitutional error requires reversal. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993). In *Brecht*, the Supreme Court found that to obtain habeas corpus relief, a petitioner alleging *Doyle* error must establish that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* In particular, the Court noted that a state's evidence of a defendant's guilt and the frequency of the prosecution's reference to a defendant's post-*Miranda* silence are factors which should be analyzed in determining whether the *Doyle* error substantially influenced the jury's verdict. *Id.*

 However, the Supreme Court has commented that "if one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected", *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), and if a judge is in "grave doubt" as to whether a constitutional error had a substantial effect on a jury, that

error is not harmless and the petitioner must win. *O'Neal v. McAninch*, — U.S. —, —, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995).

Here, due to the facts of the case and the egregiousness of the prosecutor's misconduct, we find that the *Doyle* error had a substantial influence on the jury. As discussed above, the prosecutor made frequent references to Gravley's post-arrest silence throughout cross-examination and in his closing arguments invited the jury to consider that silence as evidence of Gravley's guilt. The trial judge, for some reason, allowed this egregious conduct to take place not once, but repeatedly over the course of the trial.

The district court found that there was *Doyle* error but believed that it was harmless because Gravley's credibility had been severely damaged in front of the jury. The most damaging blow to Gravley's story—besides his prior inconsistent statement to the police—was his testimony that he had first met Guili at 10:00 p.m. the prior evening in a parking lot. This was the same time that several of Guili's friends claim that she was with them. Gravley had no one to corroborate his story that he met Guili at that time.

However, the district court failed to discuss significant problems with Guili's version of events. First and foremost of which was the fact that there was no physical evidence that Guili had been raped. The FBI lab results showed no exchange of pubic hairs between Guili and Gravley or blood in Gravley's genital area even though the incident allegedly occurred during Guili's menstrual cycle. Similarly, there was no physical evidence that Gravley was wearing pantyhose over his head while wielding a knife as Guili had claimed. The FBI's examination did not reveal hairs like Gravley's on the pantyhose and his fingerprints were not on the knife. In addition, when Guili was examined by a physician after the alleged incident, the doctor did not observe any physical evidence of "bruises or cuts or anything of that nature" or emissions in Guili's genital area. *See, Butler v. Hosking*, 47 F.3d 1167 (6th Cir. 1995) (per curiam) (noting that physician tes-

timony that there was no physical evidence of rape was a significant blow to the state's theory of non-consensual intercourse).

According to Guili, she was raped in an apartment with two other people in adjoining rooms. Yet, she did not scream out for help when Gravley allegedly forced the door open and was then permitted by him to answer two phone calls. Needless to say this raises some concern. If Gravley was attempting to rape Guili why would he allow her to answer the phone twice? Moreover, considering Guili's claim that Gravley did not want her to answer the phone, why would she not let the phone ring in hopes that the ringing would awaken the other two occupants of the apartment?

In short, we do not find this to be a case where the evidence of guilt against the accused was overwhelming. The facts by themselves do not affirmatively prove Gravley's guilt or innocence. It is clear that Gravley's credibility, or lack thereof, was the dominant factor behind his conviction. However, the jury was never allowed to simply weigh the conflicting testimonies of the parties. Instead, it was reminded over and over again that if Gravley's version of events was really true he certainly would have come forward earlier. In the face of such misconduct, we simply cannot conclude the conviction was attained through a fair judicial process. *See Martin v. Parker*, 11 F.3d 613, 617 (6th Cir.1993) ("[W]here, as here, the evidence of guilt is at best conflicting, egregious prosecutorial misconduct of this kind rises to the level of a constitutional deprivation, denying the defendant a fundamentally fair trial."); *see also United States v. Payne*, 2 F.3d 706, 712 (6th Cir.1993); *Sims v. Livesay*, 970 F.2d 1575, 1581 (6th Cir.1992) ("This is not a case where the evidence of the Gravley's guilt was so massive or multilayered as to render harmless defense counsel's errors.").

Our courts have long recognized that a prosecutor has a strong influence over a jury. *See Berger*, 295 U.S. at 88, 55 S.Ct. at 633 (noting that "improper suggestions, insinuations, and, especially assertions of personal knowledge [by a prosecutor] are apt to carry much weight against the accused when they should properly carry none"). We have

noted that this influence is even greater in cases involving sexual abuse because such cases "exert an almost irresistible pressure on the emotions of the bench and bar alike" due to the cases usually turning on the credibilities of the defendant and the prosecuting witness. *Martin*, 11 F.3d at 616–17. As a result, in such instances a "strict adherence to the rules of evidence and appropriate prosecutorial conduct is required to ensure a fair trial." *Id.*

Here, in light of the totality of the circumstances surrounding Gravley's conviction we simply cannot conclude that the jury was able to assess the facts in a manner. The FBI lab results did not support a finding that Gravley wore pantyhose over his head and wielded a knife as Guili claimed and the physician who examined Guili after the alleged incident could not find any conclusive evidence that Guili had been sexually assaulted. Against this backdrop, we are faced with a situation where the prosecutor was allowed to repeatedly make unconstitutional references to Gravley's post-arrest silence. Gravley's counsel only objected to one of these improper references at trial and challenged none of them in Gravley's motion for a new trial. Thus, the jury was allowed to believe that it could consider Gravley's post-arrest silence as evidence of his guilt. In such an instance, especially since credibility was such an important issue in the case, we simply cannot conclude that Gravley's conviction was attained through a fair and impartial judicial process as he was constitutionally guaranteed by the Sixth Amendment.

Thus, for the foregoing reasons, we **REVERSE** the decision of the district court and order that Gravley's petition for writ of habeas corpus be granted and that he either be released or given a new trial within 90 days of the issuance of this opinion. The mandate shall issue forthwith.

DAVID A. NELSON, Circuit Judge, dissenting.

Although Mr. Gravley elected to give a statement to the police after receiving his *Miranda* warnings, I shall assume, for purposes of analysis, that the precepts of *Doyle*

*v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), were violated when the prosecutor questioned him at trial about his subsequent silence. As the majority opinion notes, however, *Doyle* error does not necessarily render the results of a trial unreliable—and I am satisfied that it did not do so here.

With or without the questioning of Mr. Gravley about his failure to come up with his consensual sex story earlier, and with or without the prosecutor's brief comment thereon in final argument, it seems to me that a reasonable jury would have found that the story was a lie, just as Gravley's original denial of having been in Ms. Guili's apartment at all was a lie. The testimony given by Gravley at his trial was simply incredible, in my view—and Gravley's testimony would have been just about equally incredible if the Tennessee trial court had kept the record completely free of any possible *Doyle* error.

## I

Totally abandoning the story he told the police originally, Mr. Gravley testified at trial that he first encountered Ms. Guili in the parking lot of the Knoxville apartment complex where Gravley's mother rented a unit in which he was living at the time. The parking lot encounter was supposed to have taken place on Saturday, September 22, 1984, at around 10 o'clock in the evening. The time element is important, and Mr. Gravley went into some detail in pinning it down.

He had worked all day Saturday at an automobile dealership, Mr. Gravley testified, and he did not finish work until about 9:30 p.m. He then came home to his mother's apartment, had a bite to eat, and went back to his car about 30 minutes later.

When he returned to the parking lot, Mr. Gravley claimed, he was stopped by a young woman he later learned was Ms. Guili. "Sir, excuse me," she allegedly said; "[c]ould you tell me if it would be all right for me to leave my car parked up at the trash dumpster in the parking lot?" On being told that her car was likely to be towed if left there more than 30 minutes, according to Mr. Gravley, Ms. Guili volunteered that she was "just in from

out of town for the weekend visiting my friend, who lives in apartment A–11...."

"That's a coincidence," Mr. Gravley allegedly replied, "I live in apartment A–21 right down below you." Although he said he had to meet someone in a few minutes, Gravley testified, "I said, Maybe we'll run into each other again before the weekend is over." This was supposed to have evoked the following response from Ms. Guili:

"She said, I would like that. That would be nice. And she said, By the way, I'm going out this afternoon myself, [she] said, I should be back in before too late. She said, I'll be staying up, and I'll be by myself. If you see the light on, if and when you come back in, feel free to come up and knock."

Mr. Gravley testified that he replied "all right" and then got into his car and drove off to pick up a friend named James Worley.

Mr. Gravley further testified that he was out drinking with Mr. Worley and another man, Mark Cox, until 3:30 or 3:45 in the morning. When he returned to the apartment complex in the small hours of September 23, he continued, he saw a light on in apartment A–11.

After freshening up in his mother's apartment, Mr. Gravley told the jury, he went upstairs and knocked on Ms. Guili's door. She opened the door right away, "far enough for me to see her completely from head to toe and all," as Mr. Gravley put it.

"Hello," he allegedly said, "do you remember me? I'm the man that talked to you earlier on in the evening." Ms. Guili was supposed to have responded in these words:

"I had no idea that you would show up here. As a matter of fact, I had forgotten talking to you this afternoon. But, after talking to you, by all means, come in."

Mr. Gravley did so, he testified. After a brief conversation, Gravley continued, he asked if he could stay over until morning. "Well," Ms. Guili allegedly replied, "If it's sex you're insinuating ... I grew up under guarded conditions. I attended a Catholic high school, and I'm not too familiar with sex like most girls my age might be, you know." Ms. Guili said that she would rather not have

conventional sexual intercourse, according to Mr. Gravley, but agreed that oral sex would be "fine."

After "brief foreplay," according to Gravley's testimony, he started performing oral sex on Ms. Guili. He testified that he had "no idea" she was having her menstrual period, and never noticed the tampon she was wearing. Although interrupted when the telephone rang, Gravley said, the oral sex was resumed at the conclusion of the telephone conversation and continued until the phone rang again. After the second phone call, according to Gravley's testimony, Ms. Guili "proceeded to return the favor, so to speak," but soon broke off because he was not able to achieve an erection. Gravley then pulled up his underwear, he testified, just as Tom Enders and his cousin burst into the apartment.

Mr. Gravley's story reads to me like an adolescent fantasy straight out of the pages of *Playboy*. *Doyle* error or no, I find it hard to imagine a reasonable jury viewing Mr. Gravley's testimony as anything other than a work of fiction.

Mr. Gravley was not a rock star, after all, or a sports hero, or a charismatic politician. He was a college dropout who worked at a car dealership and lived in an apartment rented by his mother. The notion that a 21–year–old woman to whom he was a total stranger would have stopped Mr. Gravley in a parking lot at 10 o'clock on a Saturday night to give him her apartment number and an invitation to come up and see her sometime is inherently improbable, to say the least.

The improbability of Mr. Gravley's story is compounded, as it happens, by the claim that Ms. Guili initiated the supposed conversation with a question about the propriety of parking her car by the dumpster. It is a mystery to me whose car Ms. Guili was supposed to have parked there—for the evidence is uncontroverted that she had no car.

Ms. Guili lived in Nashville, the evidence showed, and came up to Knoxville with a friend to visit Lucy Tinsley. On the Saturday night in question, Ms. Guili and Ms. Tinsley were taken to a University of Tennessee fraternity party by Tammy Walcott. They left the apartment to go to the party shortly before 9:00 p.m., Ms. Tinsley testified, and they were driven back to the apartment by Bubba Gower at about 1:30 a.m. The only times Ms. Guili drove a car that evening were two occasions when she and Ms. Tinsley borrowed a vehicle to go out for cigarettes. Both times, Ms. Tinsley testified, the two women went straight back to the fraternity house.

Ms. Tinsley testified without contradiction that she was with Ms. Guili the entire time from 9:00 p.m. to 1:30 a.m. At no point within that time frame was Ms. Guili ever in the parking lot of the apartment complex, Ms. Tinsley testified, except when the young women walked to Tammy Walcott's car shortly before 9:00 o'clock. The testimony is absolutely clear that they did not encounter Mr. Gravley then. And when asked where Ms. Guili was at 10:00 p.m.—the time at which Mr. Gravley claimed to have spoken with Ms. Guili in the parking lot—Ms. Tinsley testified unequivocally that Ms. Guili "was with me at the S.A.E. house." The credibility of this testimony stands unimpeached.

In the account he gave to the jury, moreover, Mr. Gravley repeatedly attributed statements to Ms. Guili suggesting that the alleged conversation in the parking lot took place in the afternoon. But Mr. Gravley also testified that he was at work all afternoon—a fact that presumably could have been proved had he tried to claim that he talked to Ms. Guili then—and Gravley never explained why Ms. Guili should have thought that it was still "afternoon" at 10 o'clock in the evening.

Notwithstanding the surrealistic quality of Mr. Gravley's testimony, my colleagues on the panel suggest that there were "significant problems with Guili's version of events." I respectfully disagree.

The testimony given by Ms. Guili, unlike that offered by Mr. Gravley, was clear, logical, and internally consistent. Unlike Mr. Gravley's testimony, Ms. Guili's testimony did not vary materially from her earlier statements. And Ms. Guili's testimony was entirely consistent with the testimony of the other witnesses, as Mr. Gravley's was not.

Ms. Guili was subjected to lengthy cross-examination, moreover, and nothing that was developed on cross-examination would have given a rational juror any cause to doubt Ms. Guili's veracity.

It is true that there was no physical evidence of the rape. The absence of such evidence is consistent with Mr. Gravley's oral sex story, as is the fact that no menstrual fluid was detected on Mr. Gravley's groin area when he was examined some hours later. But there is abundant evidence that Ms. Guili had a tampon in place, and the notion that Mr. Gravley would not have noticed Ms. Guili's menstruation if he was really doing what he said he was doing strikes me as far more problematic than any lack of physical evidence.

The fact that Ms. Guili opened the apartment door when Mr. Gravley knocked on it gives me no concern at all. Ms. Guili was clearly expecting Tom Enders, who had telephoned to say that he would be coming over to retrieve his keys. Neither am I concerned by Ms. Guili's failure to scream when, instead of finding Tom Enders at the door, she was confronted by someone with a stocking over his head and a knife in his hand. Ms. Guili could have screamed, to be sure, but by the same token the man with the knife could have slit her throat. And that is what he threatened to do, Ms. Guili testified, unless she did everything he told her to do.

Nor should it be a source of concern to us, in my view, that Ms. Guili wanted to answer the telephone and was allowed to do so. It would have made perfectly good sense for Ms. Guili to want to speak to the person on the other end of the line to try to convey the idea that she was in trouble. And if he was holding a knife on Ms. Guili, of course, it would not have been irrational for Mr. Gravley to think that he could keep her from arousing the caller's suspicion. It would also have been reasonable for him to want to minimize the risk of another occupant of the apartment getting up to answer the phone.

We do not need to rely solely on Ms. Guili's testimony to get an idea of the signals she tried to send Tom Enders when he phoned back because he could not find the apartment complex. Mr. Enders testified that Ms. Guili sounded very different than she had sounded when he telephoned earlier. During the earlier call, he explained, she had been "totally understandable." This time, however, "she was speaking in broken sentences. She was whispering. I really didn't understand what she was saying . . . ."

Frightened and confused by Ms. Guili's inexplicable behavior on the telephone, Mr. Enders had his friend Eric Stiles place a call to her. Mr. Stiles testified that he said Tom Enders was going to come over to the apartment if Ms. Guili didn't start making sense. "Fine," Stiles said she told him in a shaky voice, "that would be great. That's what I want." Mr. Enders took the phone from Stiles at that point, according to Enders' testimony, and told Ms. Guili "I'm going to call the police and then I'm coming over." Ms. Guili simply repeated the same thing over and over, whereupon Enders hung up and organized the rescue party that ultimately flushed Mr. Gravley out of the apartment.

The testimony of Ms. Guili, Mr. Enders, Mr. Stiles, Ms. Tinsley, the investigating officers and the other prosecution witnesses all rings true to my ear. The totally unsupported testimony of Mr. Gravley, for the reasons I have tried to explain, does not.

## II

I am not alone, of course, in finding Mr. Gravley's testimony less than compelling. Rejecting a "plain error" claim on direct appeal, to begin with, a three-judge panel of the Tennessee Court of Criminal Appeals pointed out that

"[t]he testimony of the victim is unimpeached in this record, whereas the defendant's credibility underwent considerable erosion. In a statement to the police he claimed he was not present in the victim's apartment as several witnesses said he was, a claim that contrasts drastically with his trial testimony that the sexual episode was consensual." *State v. Gravley,* C.C.A. No. 1081, Jan. 6, 1987, slip opinion at 2, 1987 WL 5166.

Judge Martha Craig Daughtrey, then a member of the Tennessee Court of Appeals and now an esteemed member of our court,

was one of the panelists who concurred in this opinion.

Mr. Gravley subsequently petitioned the Knox County Criminal Court for post-conviction relief. After conducting an evidentiary hearing, that court dismissed the petition on the ground, among others, that Mr. Gravley had not been prejudiced by the allegedly ineffective assistance of his lawyer. The lawyer, in the court's words,

"was trying to convince a jury of her client's truthfulness in view of the totality of the circumstances when his earlier statement and his in court testimony, which was consistent with what he had continually told her, were contradictory." *Gravley v. Tennessee*, No. 32046, Criminal Court of Knox County Tennessee, June 17, 1988.

It is hardly surprising that counsel was unsuccessful. One wonders if Clarence Darrow himself could have won an acquittal in this case.

The dismissal of the petition for post-conviction relief was appealed to the Court of Criminal Appeals, where the dismissal was affirmed by a different three-judge panel. After quoting the passage in which the earlier panel had contrasted the "erosion" of Mr. Gravley's credibility with the "unimpeached" testimony of the victim, the Court of Criminal Appeals held that any *Doyle* error was harmless: "We are satisfied beyond a reasonable doubt that absent [the] evidence of pretrial silence and the prosecutor's comments thereon, no reasonable jury would have accepted the petitioner's testimony given at trial." *Tennessee v. Gravley*, C.C.A. No. 1233, March 6, 1990, slip opinion at 8.

The standard applied by the Tennessee Court of Criminal Appeals in 1990 was the "harmless beyond a reasonable doubt" standard explicated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Subsequent to the Tennessee court's decision, however, the Supreme Court of the United States held, in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), that the *Chapman* standard is not to be used in determining whether to grant habeas relief on the basis of *Doyle* error. In cases of this type, the Su-

preme Court held, habeas courts must use the less onerous standard of *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Under the *Kotteakos/Brecht* standard, habeas relief is only to be granted if the *Doyle* error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. at 1714 (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253).

If Mr. Gravley was not entitled to habeas relief under the *Chapman* standard, it follows *a fortiori* that he was not entitled to habeas relief under the *Kotteakos/Brecht* standard. So the district court was to hold.

After Mr. Gravley filed his federal habeas petition, United States Magistrate Judge Thomas W. Phillips prepared a comprehensive report and recommendation in which he took note of *Brecht* and concluded that the trial error complained of was harmless. Summing up, the magistrate judge expressed himself as follows:

"After review of the trial transcript, it appears that the most devastating aspect of this trial in regard to petitioner's credibility was petitioner's performance on the stand. It is fair to say that the errors not objected to and which were not raised in the new trial motion did contribute somewhat to undermining the credibility of petitioner and could not be considered sound trial strategy. However, in my view, the errors did not make the result of this trial unreliable. Following the lead of the Supreme Court in such cases, the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2043, 80 L.Ed.2d 657 (1984). I am not convinced that counsel's performance caused petitioner to lose what he otherwise would have won (*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct.

2052, 80 L.Ed.2d 674 (1984))[,] and it is not apparent that defeat was snatched from the hands of probable victory (*United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992), *cert. denied*, 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993))." Slip opinion at 20–21.

United States District Judge James H. Jarvis agreed with the recommendation of the magistrate judge. Like all of the other judges who had examined the trial record up to that point, Judge Jarvis found that whereas the testimony of Ms. Guili was virtually unimpeached, the testimony of Mr. Gravley, "replete with untruths, was simply not credible." Moreover, Judge Jarvis observed, the evidence of Mr. Gravley's silence was not of "predominant importance." The *Doyle* evidence

"was mentioned four times during testimony over two days. The assistant district attorney mentioned it in only two sentences during his closing argument. I conclude that the *Doyle* error did not 'substantially influence' the jury's verdict under the *Brecht* standards and the error was harmless." Slip opinion at 22–23 (footnote omitted).

I agree. The denial of Mr. Gravley's habeas corpus petition should be affirmed, in my opinion.