RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOSEPH HENDRIX,

　　　　　*Petitioner-Appellee/Cross-Appellant*,

　　　*v.*

CARMEN PALMER, Warden,

　　　　　*Respondent-Appellant/Cross-Appellee*.

Nos. 16-2279/2310

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-14659—Avern Cohn, District Judge.

Argued: April 25, 2018

Decided and Filed: June 26, 2018

Before: GILMAN, COOK, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Linus Banghart-Linn, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant/Cross-Appellee. Michael Skinner, LAW OFFICES OF MICHAEL SKINNER, Lake Orion, Michigan, for Appellee/Cross-Appellant. **ON BRIEF:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant/Cross-Appellee. Michael Skinner, LAW OFFICES OF MICHAEL SKINNER, Lake Orion, Michigan, for Appellee/Cross-Appellant.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge. Joseph Hendrix is currently serving a life sentence imposed by a Michigan state court following his conviction for felony murder,

carjacking, and unlawfully driving away a motor vehicle. The district court conditionally granted Hendrix's application for a writ of habeas corpus brought under 28 U.S.C. § 2254. Warden Carmen Palmer (the State) appeals the issuance of the writ, and Hendrix cross-appeals the denial of relief on several alternative claims.

At trial, the State presented evidence that Hendrix committed a carjacking that resulted in a woman's death. The evidence included statements that Hendrix made to the police after being reinterrogated following the invocation of his right to counsel—statements that the State now concedes were inadmissible under Supreme Court precedent. Hendrix's trial counsel failed to challenge the admissibility of these statements, however, and they became central to the State's case.

On direct appeal in the Michigan courts, Hendrix challenged the admission of these statements as violating his Fifth Amendment rights under *Miranda* and its progeny. He also argued that his counsel's failure to challenge the statements' admission violated his Sixth Amendment right to the effective assistance of counsel. The State opposed Hendrix's claims on the theory that its use of the statements was proper. Michigan's courts uniformly denied Hendrix relief.

Hendrix then brought this federal habeas action. After the district court ordered oral argument on Hendrix's Fifth Amendment claim, the State changed its position, conceding for the first time that Hendrix's statements were admitted erroneously, but now arguing that the error was harmless. The district court granted habeas relief on Hendrix's Fifth and Sixth Amendment claims, but denied relief on his other claims. Hendrix and the State both appealed.

For the reasons set forth below, we (1) **AFFIRM** the judgment of the district court granting Hendrix habeas relief based on his Fifth and Sixth Amendment claims; (2) **REVERSE** the district court's denial of Hendrix's *Doyle* claim; and (3) **AFFIRM** the holding of the district court that the evidence was sufficient to support Hendrix's conviction. Hendrix is therefore entitled to the habeas relief granted by the district court, but the State is entitled to retry him if it so desires, subject to the time constraint imposed by the district court. The remaining issues raised by Hendrix are moot, and we do not consider them.

# I. BACKGROUND

## A.    Factual background

On the evening of September 5, 2006, Gina Doen was running errands with her mother and daughter in Shelby Charter Township, Michigan, located about 15 miles north of Detroit. Gina parked her Dodge Caravan at a strip mall and, along with her daughter, walked into a dry cleaner. Her 65-year-old mother, Evangeline Doen, remained in the minivan, so Gina left the vehicle's doors unlocked and the keys in the ignition. After about five minutes in the dry cleaner, Gina walked out and saw her mother lying on the pavement. The minivan was gone. Her mother's head was bleeding.

The police arrived minutes later, and Evangeline Doen was taken to the hospital. Although Evangeline had sustained a serious head injury, she was still conscious and able to speak. At the hospital, Evangeline told a police officer what had happened.

The officer testified at Hendrix's trial that Evangeline told him that she had been sitting in the front seat of the minivan when a man got into the driver's seat. Evangeline "told this young man that he had got the wrong car, he got into the wrong car," but the man "told her to get out and started backing up the van." She tried to get out, but as she was struggling to remove her seatbelt, the man pushed her out the door. Evangeline described the carjacker as a "tall, thin, white male with possible glasses, and . . . possible blonde hair . . . [and] some mention about a brown shirt."

Approximately six hours after the carjacking, at around 1:30 a.m. on September 6, 2006, Officer Kyle Bryent encountered the stolen minivan parked at a gas station in an area of Detroit known for drug trafficking. Hendrix was inside. Officer Bryent had previously arrested Hendrix in the same area, although the record does not disclose the reason for that arrest. After Officer Bryent removed Hendrix from the minivan and arrested him, Sergeants Brad Ferguson and Stan Muszynski transported Hendrix from Detroit to Shelby Charter Township.

Hendrix had brown hair at the time of his arrest. Inside the minivan, officers found a beige and white cap, a black knit hat, a white do-rag, and a makeup bag. Hendrix's girlfriend,

Michelle Zlatevski, later told the police that the makeup bag was probably hers.  Fingerprints belonging to Hendrix were found on the vehicle's rearview mirror and sliding door.  Officers also found fingerprints that belonged to neither Hendrix nor Gina.

Once in the police car, Hendrix acknowledged and waived his *Miranda* rights.  Sergeant Muszynski then questioned him about how he acquired the minivan.  Hendrix stated that he did not know how he acquired the minivan and did not know what to say.  He appeared "very nervous."

Later that morning, Detective Terry Hogan removed Hendrix from his jail cell for interrogation.  Detective Hogan described the interrogation in his police report:

> At approx. 7:30 AM I escorted Hendrix from the Shelby Twp cell block to the interview room.  I advised Hendrix of his rights off the Shelby Twp advise [sic] of rights forms.  Hendrix refused to speak with me until he had the opportunity to speak with an attorney.  I returned Hendrix to the cell block without any further questioning.

An advice-of-rights form signed by Hendrix confirms that he requested an attorney.  Detective Hogan later testified that, at this meeting with Hendrix, he informed Hendrix that a woman was seriously injured during the minivan's carjacking and that she might die from her injuries.  The record does not reveal when during this meeting Detective Hogan informed Hendrix of the seriousness of the victim's condition, but Detective Hogan's trial testimony strongly implies that it was after Hendrix had refused to cooperate.

Despite Hendrix having requested an attorney at the September 6 meeting and not yet having met with one, Detective Hogan sought to interrogate him again two days later.  As Detective Hogan recorded in a report:  "On 9/8/06 myself and D/Sgt. Muszynski again tried to interview suspect Joseph Hendrix."  Detective Hogan presented Hendrix with another advice-of-rights form at the September 8 meeting, which Hendrix refused to sign.  Hendrix, according to Detective Hogan, nonetheless agreed to speak with him.

At trial, the State elicited little testimony regarding Hendrix's statements to the police on September 6.  But it elicited extensive testimony regarding his statements on September 8.  Detective Hogan testified that; on September 8, Hendrix did not want to say where he was during

the evening of September 5.  Hendrix stated only that he had been in Sterling Heights and had called his grandmother's house from a 7-Eleven store.  But investigators found no evidence of a call from area pay phones to Hendrix's grandmother, although his grandmother told Detective Hogan that she remembered receiving a call from Hendrix that day.

Detective Hogan also testified that Hendrix had cryptically said to "just check with [the Detroit Police Department], they know the truth."  Finally, Hendrix asked Detective Hogan "if he was going to be charged with murder or homicide."  Soon afterwards, Hendrix clammed up, saying "I don't think I'm going to say anymore, because . . . I don't want to get into anymore trouble."

Detective Hogan further testified that he surmised from Hendrix's reluctance to divulge his September 5 whereabouts that Hendrix was "afraid to admit that he's the one that actually pushed Mrs. Doen out of the vehicle."  He considered Hendrix's silence "noteworthy" because "[i]f he's not the thief, he's not going to want to be charged with a crime of that type of nature."

Evangeline Doen died on her tenth day in the hospital, having suffered from a subdural hematoma.  At trial, the medical examiner testified that her death was primarily caused by "blunt force head trauma," consistent with a "decent fall like from the back of your head with the concrete."

The State also sought to link Hendrix to the carjacking with evidence that he had committed similar thefts in the past.  In particular, the State emphasized that the circumstances of the carjacking—including its occurrence near Hendrix's residence, the carjacker's opportunistic use of keys left in the ignition, and the minivan's ultimate destination in a drug-trafficking area of Detroit—were consistent with the circumstances of prior vehicle thefts that Hendrix had committed.

The State presented evidence that the first such theft occurred approximately four years earlier, "just right around the block" from where Hendrix lived.  Jeffrey Piontkowski testified that, in December 2002, he walked out of a restaurant to see a man behind the wheel of his 1985 GMC pickup truck.  Trying to thwart the theft, Piontkowski opened one of the truck's doors and

managed to get his hand and foot inside.  But as the thief started driving away, Piontkowski was thrown off the truck and onto the pavement.  Hendrix later pleaded guilty to the theft.

The State also presented evidence that Hendrix had stolen two vehicles only days before the theft of Gina Doen's minivan, again in areas near his residence.  Maureen Scott testified that, on August 31, 2006, her Ford Explorer was stolen from a parking lot outside of a Little Caesar's Pizza.  She had left her keys in the vehicle.  The police found the Explorer shortly after midnight the following day, crashed into a telephone pole about two blocks from where Doen's minivan was later found.  Inside the Explorer were two inmate bracelets and an arraignment sheet, all belonging to Hendrix.

Next, Louie George testified that, on September 3, 2006, his 2005 Dodge Ram was stolen while parked in front of a 7-Eleven store.  He had left the doors unlocked and the keys inside.  The police discovered the truck in Detroit shortly thereafter, roughly two blocks from where they had found Scott's Explorer.  Hendrix was alone inside.

Detective Hogan testified that, in his opinion, the shared characteristics of these prior vehicle thefts suggested that Hendrix had a modus operandi.  The detective also noted that no similar thefts had occurred since Hendrix's arrest.  For these reasons, and because of Hendrix's September 8 statements, Detective Hogan believed that Hendrix had stolen Gina Doen's minivan.

The State also adduced evidence of a motive that could explain Hendrix's modus operandi.  Several officers testified that the area where they discovered the Ford Explorer, the Dodge Ram, and the Dodge Caravan is a known narcotics area—"poor" and full of "drug houses"—where addicts can trade cars for drugs and sex.  Such thefts are usually crimes of opportunity, the officers said, which means that drug addicts typically steal cars from areas near where they live or work.  Professional car thieves, in contrast, typically take orders to steal particular kinds of cars, which might not be readily at hand, so such thieves are more likely to steal cars in areas further from their homes.

During closing argument, the prosecutor emphasized to the jury that, since Hendrix's arrest, "there haven't been any car thefts like that," and the "car thefts stopped after he was

locked up." The prosecutor also spent considerable time making the following points that Hendrix has challenged as improper: that Hendrix presented no alibi witnesses; that the police would not bring charges against an innocent person; and that Hendrix had already shown himself, by his theft of Piontkowski's GMC pickup truck, to be capable of violence.

Further, in his closing argument, the prosecutor relied heavily on Hendrix's silence on September 8 as evidence of guilt. The relevant portion of that argument is as follows:

> What's more important now is Detective Hogan's interview with [Hendrix] on September 8 at the Macomb County Jail. Detective Hogan says a woman was badly injured, pushed out of that minivan, and she might die, and this is your opportunity to tell what happened. In other words, maybe not verbalize precisely as follows goes like this: Tell me where you were, give me an alibi, who were you with, and how did you obtain the vehicle? Because if you can give me that information, then I can investigate it, and I can clear you. There's no question to 14 of you [on the jury] that if Defendant had an alibi for his whereabouts say between 6:00 p.m., 7:30 p.m., he wouldn't have been charged. The alibi would have been investigated, and if true, he wouldn't be charged with this carjacking. Where was he? Ask yourselves where was he? We're not asking where he was from 3:00 a.m. to 5:00 a.m., where he might have been sleeping alone where nobody knows. Everybody knows where he was and where she was two days earlier, or three days earlier during the evening, everybody knows that. Now, he's in the County Jail, knows he's been arrested for a crime in connection with this car theft, carjacking, yet, and he's had time to think about it too, and here comes Terry Hogan. Now, the defense, not Mr. Sheikh, he's a great guy, but the Defendant might be thinking well, Hogan is my enemy, Hogan just wants to frame me. But, Hogan wants to find out who did this. This is a serious case where a woman might die. And she did die. Hogan wants to know who did it. The Defendant has the alibi, and the alibi can be verified. Alibis easily can be verified. For example, what if Defendant were at home and engaged in a long telephone call: The telephone bills would support that, that he was on the phone from say six to eight p.m., or if he went to a restaurant, saw him use a credit card, that could be verified. If he's at a friend's house, a relative's house, that all could be verified. The point is if he had an alibi, he would have told Detective Hogan. But, there is no alibi. And you know why there's no alibi? Because there's no alibi. He has none. He has none. There is no doubt in this world that if had an explanation for where he was at that time, on that day, we would know it. He would have told Sergeant Ferguson, and if not Sergeant Ferguson, he would have told Detective Hogan. When he can't tell where he is, what does that mean? Because he wasn't anywhere other than Vineyards parking lot at around 6:50 p.m. Committing his thefts by his unique modus operandi. . . . He's not some 16-year-old kid, somebody facing his first trouble with the law. He's been around. He knows the drill. And he has heard from Detective Hogan that the woman might

die. Now, ask yourselves, would anybody with any intelligence know that he's about to face a very serious charge, carjacking, and felony murder if the woman dies. If you're not the person who took the car at Vineyards, you're going to be clambering [sic], be wailing. Detective, let me tell you what happened. This is how I got the car, Detective. I didn't want to say anything before, but here's how it happened. Never. Not one word. He says, oh, I don't want to say anymore, because it will get me into trouble. He tells Sergeant Ferguson, I don't know how I got the minivan. He knows, he's the thief.

The prosecutor then continued:

[The police] did what they could, and finally the Defendant had an opportunity to tell us what happened on September 6 and September 8 and he didn't. His silence is defining, his silence speaks a thousand words. His silence in refusing to say from where he made the call, how he obtained the vehicle, and who he was with during the important times. That's like a thunderbolt from the sky. In other words, he's saying, I did it. Because if I didn't do it, I'll tell you why. And by the way here we are, six months and 16 days since the incident. And have you been presented with an alibi witness for the Defendant? No. Not one. Not one who can say he or she was with the Defendant, 5:00, 6:00, 7:00, 8:00. Not one.

Immediately after this argument, the trial court sua sponte instructed the jury that it could not draw any adverse inference from the fact that Hendrix had not testified at trial. But the court drew a distinction between Hendrix's silence in court and his silence while in custody, erroneously instructing the jury that it could consider Hendrix's silence in custody as evidence of his guilt.

The jury found Hendrix guilty of carjacking, felony murder, and unlawfully driving away a motor vehicle. He was sentenced to life in prison.

**B.      Procedural background**

The procedural history of this case is complex. Hendrix initially appealed his conviction to the Michigan Court of Appeals. In that court, he filed a motion to remand so that he could investigate the same *Miranda* and ineffective-assistance claims that he still presses today. Critically, his motion to remand presented the Michigan Court of Appeals with evidence that his statements on September 8, 2006 were obtained in violation of his constitutional rights. It also made claims of prosecutorial misconduct, error in admitting evidence of prior bad acts, and insufficient evidence.

In a one-page order, the Michigan Court of Appeals summarily denied Hendrix's motion to remand "for failure to persuade the Court of the necessity of a remand at this time." The court affirmed Hendrix's convictions in a separate opinion.

Hendrix then filed an application for leave to appeal with the Michigan Supreme Court, raising the same claims. That Court remanded to the Michigan Court of Appeals with orders to address Hendrix's claim regarding the alleged insufficiency of the evidence.

On remand, the Michigan Court of Appeals rejected that claim and again affirmed Hendrix's convictions. Hendrix filed this federal habeas action after the Michigan Supreme Court denied his second application for leave to appeal. At the same time, however, Hendrix moved to stay the proceedings so that he could return to the state courts and file a motion for relief from judgment. The district court granted the stay.

Returning to the state trial court, Hendrix filed a motion for relief from judgment. That motion sought relief on the grounds that (1) Hendrix's trial counsel was ineffective for failing to adequately investigate evidence that, after Hendrix's arrest, thefts of unlocked vehicles whose keys had been left in the ignition had continued; (2) the prosecutor posed improper questions to witnesses and presented improper burden-shifting arguments to the jury; and (3) Hendrix's appellate counsel provided ineffective assistance by not raising these issues in Hendrix's direct appeal. Finding each of these claims meritless, the trial court denied Hendrix's motion for relief from judgment.

Next, Hendrix filed an application for leave to appeal to the Michigan Court of Appeals. That application was denied. Hendrix then filed an application for leave to appeal to the Michigan Supreme Court. That application was denied as well. Finally, Hendrix moved to reopen this federal habeas action in the district court. The court granted the motion and ordered oral argument on Hendrix's Fifth Amendment claim. In supplemental briefing, the State conceded for the first time that the admission of Hendrix's September 8, 2006 statements was erroneous. It maintained, however, that the error was harmless.

The district court disagreed. Concluding that Hendrix was entitled to relief on his Fifth and Sixth Amendment claims, the court issued a conditional writ of habeas corpus, ordering the

State to either take action within 90 days to afford Hendrix a new trial or unconditionally release him from custody.  *Hendrix v. Palmer*, 205 F. Supp. 3d 895, 907, 909, 911 (E.D. Mich. 2016).

## II.  ANALYSIS

### A.     Standard of review

"In a habeas corpus appeal, we review the district court's legal conclusions de novo, but will not set aside its factual findings unless they are clearly erroneous."  *Fleming v. Metrish*, 556 F.3d 520, 524 (6th Cir. 2009) (quoting *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007)).  Where, as here, a state court has adjudicated the merits of a petitioner's claims, the federal courts must review those claims under the standard set out in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241 et seq.  This standard is highly deferential to the state courts.  *Miller v. Stovall*, 742 F.3d 642, 645 (6th Cir. 2014).

Under the AEDPA standard, a federal court may not grant habeas relief unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state-court decision is contrary to clearly established federal law if the two are "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"  *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring) (quoting Webster's Third New International Dictionary 495 (1976)).  Alternatively, a state-court decision is based on an unreasonable determination of the facts if it is "'objectively unreasonable,' not simply erroneous or incorrect."  *Fleming*, 556 F.3d at 525 (quoting *Williams*, 529 U.S. at 409).  A state court's factual determinations are entitled to a presumption of correctness that is rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**B.** **The Michigan courts adjudicated Hendrix's claims on the merits, so AEDPA's elevated standard of review applies.**

A threshold question is whether the Michigan courts adjudicated Hendrix's claims on the merits. This question is significant because claims adjudicated on the merits in a state-court proceeding are reviewed under AEDPA's highly deferential standard. Hendrix argues that the Michigan courts did not adjudicate the merits of his *Miranda* and ineffective-assistance claims, but he makes no such argument regarding his other claims.

Hendrix presented his *Miranda* and ineffective-assistance claims to the Michigan Court of Appeals in documents titled "Appellant's Brief on Appeal" and "Motion to Remand." That court summarily denied the motion to remand "for failure to persuade the Court of the necessity of a remand at this time." Hendrix then filed a motion for reconsideration of the *Miranda* issue. The court summarily denied that motion as well.

Under binding precedent, the denial of Hendrix's motion to remand constituted an on-the-merits adjudication of the claims presented in that motion. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

This court, in *Nali v. Phillips*, 681 F.3d 837, 851–52 (6th Cir. 2012), applied *Harrington*'s ruling in the context of a procedural history much like that here. The petitioner in *Nali* presented the Michigan Court of Appeals with a "motion to remand so that the trial court could hold an evidentiary hearing to develop the factual record" regarding his ineffective-assistance claim. *Id.* at 852. In words very similar to those it used here, the Michigan Court of Appeals "denied [the petitioner's] motion to remand 'for [petitioner's] failure to persuade the Court of the need to remand' the case at that time." *Id.* (second alteration in original) (quoting the state court's order). This court held that Nali's ineffective-assistance claim had been adjudicated on the merits by the Michigan Court of Appeals. *Id.*

Here, the same state court used substantially the same language to dispose of Hendrix's *Miranda* and ineffective-assistance claims. Based on *Nali*, those claims are deemed to have been

adjudicated on the merits. We therefore review all of Hendrix's claims under AEDPA's elevated standard of review.

**C.     As the State now concedes, Hendrix's September 8, 2006 statements to the police were obtained in violation of his Fifth Amendment rights, making their admission at trial erroneous.**

Hendrix argued throughout his direct appeal that the trial court erred in admitting Detective Hogan's testimony regarding Hendrix's September 8 statements. The State opposed that argument in the Michigan courts. But after Hendrix filed this federal habeas action, the State finally conceded—"after all this time," as the district court ruefully put it—that the trial court's admission of testimony regarding Hendrix's September 8 statements was erroneous. *Hendrix v. Palmer*, 205 F. Supp. 3d 895, 903 (E.D. Mich. 2016).

The governing law is beyond dispute. A person "held for interrogation must be clearly informed" that he has the right "to remain silent," "to consult with a lawyer[,] and to have the lawyer with him during interrogation." *Miranda v. Arizona*, 384 U.S. 436, 471, 473–74 (1966). After these warnings are given, if the person "indicates in any manner . . . that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74. This is because "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474.

Accordingly, "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). The *Edwards* rule against reinterrogation, moreover, is not offense-specific: "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (emphasis in original).

A reinterrogation of the kind proscribed by *Edwards* is precisely what happened here. Hendrix invoked his Fifth Amendment rights on September 6, 2006, shortly after making several statements to the police. Detective Hogan nonetheless reapproached him two days later, administered a new set of *Miranda* warnings, and resumed the interrogation, ostensibly with Hendrix's consent, although Hendrix refused to sign a new advice-of-rights form. Because these

actions by Detective Hogan violated the *Edwards* rule against reinterrogation, the trial court erred in admitting the testimony regarding Hendrix's September 8 statements.  Whether this error was harmless is thus the dispositive question.

**D.      The erroneous admission of Hendrix's September 8, 2006 statements was not harmless; to the contrary, it had a substantial and injurious effect on his defense.**

Not all constitutional errors that are brought to light on habeas review require reversal. *Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009) ("If the constitutional error had no material effect, the verdict must stand.").  "Reviewing courts normally disregard trial errors that are harmless."  *O'Neal v. McAninch*, 513 U.S. 432, 434 (1995).  Harmlessness is determined "under the 'substantial and injurious effect' standard."  *Fry v. Pliler*, 551 U.S. 112, 121 (2007).  The Supreme Court has purposefully framed this standard as a question to be answered by the judge, who must ask himself or herself:  "Do I, the judge, think that the error substantially influenced the jury's decision?"  *O'Neal*, 513 U.S. at 436.

Under *O'Neal*, if the judge is certain that the error had no effect or only a small effect, the verdict must stand.  But if the judge "is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless.  And, the petitioner must win."  *Id.* at 436 (internal quotation marks omitted).  The term "'grave doubt' . . . mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  *Id.* at 435.  An "uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict."  *Id.*

In conducting this inquiry, a court is prohibited from "'stripping the erroneous action from the whole' and determining the sufficiency of what is left 'standing alone.'"  *Ferensic v. Birkett*, 501 F.3d 469, 483 (6th Cir. 2007) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  Instead, the court must view the circumstances through a "wider lens," *id.*, "pondering all that happened," *Kotteakos*, 328 U.S. at 765.

We agree with the district court's determination that the admission of testimony regarding Hendrix's September 8 statements was not harmless, and instead was likely to have

had a substantial and injurious effect on his defense.  In closing arguments, the prosecutor emphasized the significance of Hendrix's September 8 statements, describing them as "more important" than the September 6 statements because, by September 8, Hendrix had been informed that a woman was seriously injured during the minivan's theft, yet Hendrix still offered no alibi.  (Hendrix had in fact, by September 8, had two days to mull over this information.)  The prosecutor described Hendrix's silence in the face of this information as "defining."  It "speaks a thousand words," he said, and is "like a thunderbolt from the sky" that says, "I did it."

As Hendrix argues, his September 6 statements were not as inculpatory as his September 8 statements because, at the point on September 6 when he invoked his *Miranda* rights, the police had not yet told him that a woman was seriously injured during the minivan's theft.  If Hendrix did not commit the carjacking, then he presumably would have had no reason to know that he was driving a vehicle connected with a potential homicide.  He therefore would have had less incentive to speak to the police about how he acquired the minivan.  The police already knew that he was in possession of a stolen vehicle, so with respect to that offense, he had little to gain by providing more information.  Moreover, if the September 8 statements had not been admitted into evidence, then Hendrix could have explained his September 6 statements by saying "I didn't know how much trouble I was in."  The State's case against Hendrix thus drew substantial force from the argument that Hendrix knew on September 8 that he might be charged with murder, yet he offered no alibi.

And what Hendrix *did say* during the September 8 interview further prejudiced his defense.  For one thing, Hendrix asked Detective Hogan if he would be charged with murder.  He thereby betrayed a kind of anxious curiosity that, absent a contemporaneous and persuasive denial of responsibility, is suspicious.  After asking this question, Hendrix ended the interrogation, telling Detective Hogan:  "I don't think I'm going to say anymore, because . . . I don't want to get into anymore trouble."  This statement, too, tends to suggest an anxiety—if not an expectation—that deeper trouble lay ahead.

Hendrix also told Detective Hogan that, on the day of the carjacking, he had been in Sterling Heights and had made a phone call from a 7-Eleven store.  He also said:  "[J]ust check with [the Detroit Police Department], they know the truth," and "DPD knows, check their

video." These narrative fragments did nothing to aid Hendrix's defense. Instead, they presumably hurt his credibility because they appear to contradict each other. Sterling Heights, after all, is not within the jurisdiction of the Detroit Police Department, so the Detroit police would have had no reason to have a video of Hendrix if he actually had been in Sterling Heights at the time of the carjacking. And conversely, if the Detroit Police Department did have a video of Hendrix, then he was very unlikely to have been in Sterling Heights.

Hendrix's statement that he called his grandmother from a 7-Eleven store was also problematic for him because it was susceptible to being disproved. As the prosecutor pointed out in his closing argument, the existence of a phone call could probably be confirmed with telephone records, but Hendrix presented no such records. And Detective Hogan testified that he had been unable to confirm that the 7-Eleven phone call actually occurred.

Viewed as a whole, Hendrix's September 8 statements were inculpatory because of their incoherence. They smack of nonsense. And what Hendrix did *not* say on September 8 was inculpatory as well. His failure to muster a credible alibi when he knew the gravity of his situation enabled the prosecutor to argue persuasively that Hendrix had no alibi because he was guilty. The force of that argument, as well as the amount of time that the prosecutor spent developing it in his closing argument, strongly supports the view that the erroneous admission of the September 8 statements likely had a substantial and injurious effect on Hendrix's defense. For these reasons, we agree with the district court's determination that the error of admitting the September 8 statements was not harmless.

**E.     The failure of Hendrix's trial counsel to challenge the admission of Hendrix's September 8 statements constituted ineffective assistance.**

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court summarized the standard for determining whether counsel's assistance was so defective as to require that a conviction be reversed:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the

defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Whether counsel's performance was "deficient" under the first prong is determined by reference to "an objective standard of reasonableness"—specifically, "reasonableness under prevailing professional norms." *Id.* at 688. This inquiry "consider[s] all the circumstances" of a particular case. *Id.* at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Further, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

As to the second prong of the *Strickland* test, a petitioner must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. Counsel's errors must have "actually had an adverse effect on [the petitioner's] defense." *Id.*

AEDPA adds another layer of deference to our review. *See* 28 U.S.C. § 2254(d)(1). This means that our review of the state court's adjudication of Hendrix's *Strickland* claim must be "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "The question 'is not whether a federal court believes the state court's determination' under *Strickland* 'was incorrect[,] but whether [that determination] was unreasonable—a substantially higher threshold.'" *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). To qualify as "unreasonable," the state court's adjudication of the claim must have been "so lacking in justification" that it amounts to "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). With these principles in mind, we now apply the two prongs of the *Strickland* test to the facts of this case.

**1. *Counsel's performance was deficient.***

"[A] single, serious error may support a claim of ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986). Such an error can flow from a failure to file a plainly meritorious motion to suppress. *Id.* at 375, 385. But "the failure to file a [meritorious] suppression motion does not constitute *per se* ineffective assistance of counsel." *Id.* at 384. For such a failure to constitute deficient performance, the meritorious nature of the motion must be so plain that "no competent attorney would think a motion to suppress would have failed." *Premo v. Moore*, 562 U.S. 115, 124 (2011). A petitioner also must show that counsel had no reasonable strategic rationale for not filing the motion. *Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir. 2011) (en banc) (applying the rule from *Strickland*, 466 U.S. at 690–91, that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

In *Poindexter v. Booker*, 301 F. App'x 522, 529 (6th Cir. 2008), this court held that the petitioner's counsel provided ineffective assistance when he failed to interview two available alibi witnesses. These witnesses had accompanied the petitioner to his meetings with counsel, yet counsel never asked them any questions despite knowing that one of them had been with the petitioner at the time of the shooting with which he was charged. *Id.* One of the alibi witnesses went so far as to approach the petitioner's counsel after these meetings, on his own initiative, to express his willingness to testify on the petitioner's behalf. *Id.* But counsel still did not interview the witnesses, much less present them as witnesses at trial. *Id.* This court held that counsel's "[f]ailure to investigate two alibi witnesses, particularly when [they] both personally offered to provide testimony beneficial to [the petitioner], is . . . objectively unreasonable" and "not the product of sound trial strategy." *Id.* Further, the *Poindexter* court held that the state court's contrary conclusion was an unreasonable application of *Strickland*. *Id.*

Hendrix's counsel in the present case was similarly unreasonable in failing to move to suppress the September 8 statements. The meritorious nature of a motion to suppress, under these circumstances, is clear from blackletter law. *See Edwards v. Arizona*, 451 U.S. 477, 486 (1981); *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). Hendrix's counsel had access to all the facts that should have led him to conclude that the September 8 statements were inadmissible,

and not filing a motion to suppress had no conceivable strategic benefit for Hendrix because the September 8 statements offered nothing in the way of an alibi. If anything, they created the impression of a person unable to muster an innocent explanation for how he had acquired a stolen vehicle. The statements also enabled the prosecution to tell the jury that Hendrix had offered no alibi even after being informed that the vehicle was connected to a potential homicide. *See Franklin v. Anderson*, 434 F.3d 412, 430–31 (6th Cir. 2006) (holding that "the failure to raise the [meritorious] biased juror issue on appeal was prejudicial, since no claims of strategy can excuse the seating of a juror unable to follow the law").

This is not a situation where, for example, an attorney decided not to call a witness whom he believed might expose his client to additional risks. *See Davis*, 658 F.3d at 537–38 (concluding that an attorney's decision not to call his client's codefendant as a witness had been reasonable and strategic because the attorney did not want the jury to associate his client with someone who had already pleaded guilty and who might invoke the Fifth Amendment to avoid additional exposure). Rather, the failure of Hendrix's counsel to file a motion to suppress exposed Hendrix to adverse evidence that could have been avoided. Counsel's inaction therefore constituted deficient performance.

### 2. *Counsel's error prejudiced Hendrix's defense.*

The prejudice analysis is duplicative of the analysis previously conducted to determine if the statements' admission likely had a substantial and injurious effect on Hendrix's defense. This element is met as well, for all the same reasons.

Because counsel's failure to file an indisputably meritorious motion constituted deficient performance that prejudiced Hendrix's defense, counsel rendered ineffective assistance. The contrary decision of the Michigan Court of Appeals was unreasonable given the nature and effect of the constitutional violation. Hendrix is therefore entitled to habeas relief on his Sixth Amendment claim.

**F.      The prosecutor's comments on Hendrix's post-*Miranda* silence violated due process.**

Hendrix also urges us to overturn the district court's holding that the prosecutor did not violate Hendrix's due-process rights by improperly commenting on his silence.  Although the Fifth and Sixth Amendment violations discussed above by themselves entitle Hendrix to relief, we feel compelled to reach this due-process issue because it is likely to arise again if Hendrix is retried.

The State's position is that Hendrix did not remain silent after receiving his *Miranda* warnings.  He instead spoke with Sergeants Ferguson and Muszynski shortly after his arrest on September 6, and he spoke with Detective Hogan on September 8.  According to the State, Hendrix's decision to speak with the police entitled the prosecutor to comment on everything that Hendrix did *not* say.  The district court accepted this argument and concluded that the prosecutor's remarks were not improper.  *Hendrix v. Palmer*, 205 F. Supp. 3d 895, 909 (E.D. Mich. 2016).

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court held that the "use for impeachment purposes of [a] petitioner['s] silence . . . after receiving Miranda warnings[] violate[s] the Due Process Clause of the Fourteenth Amendment."  *Doyle* therefore "bars the use against a criminal defendant of silence maintained after receipt of governmental assurances." *Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam).

The State's argument on this issue relies on *Anderson*.  In *Anderson*, the defendant was arrested while in possession of the murder victim's car.  447 U.S. at 404.  He waived his *Miranda* rights and told the arresting officer that he had stolen the car from a specific area.  *Id.* at 405.  But at trial, the defendant changed his story, testifying that he had stolen the car from a parking lot approximately two miles from the area that he had previously identified.  The prosecutor cross-examined the defendant about this discrepancy.  *Id.*  Critically, the prosecutor did not question him about any omissions; the prosecutor simply elicited testimony designed to highlight the discrepancy between the defendant's statements.  *Id.* at 405–06.

In a petition for a writ of habeas corpus, the defendant in *Anderson* argued that the discrepancy resulted from omissions in his initial statement.  *Id.* at 406–07.  These omissions, the

defendant argued, were tantamount to silence. *Id.* The Supreme Court rejected this argument, explaining that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408. The Court thus held that when a defendant makes inconsistent statements, his omission of facts from one statement (which facts he includes in a later statement) does not constitute silence under *Doyle*. *Id.* at 409.

But *Anderson* does not suggest, as the district court seemed to believe, that *Doyle* is inapplicable whenever a defendant chooses to speak; it simply teaches that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." *Id.* The district court's overestimation of *Anderson*'s breadth apparently resulted from a superficial reading of this court's decision in *United States v. Crowder*, 719 F.2d 166 (6th Cir. 1983) (en banc). In rejecting Hendrix's *Doyle* claim, the district court relied on *Crowder*'s remark that "[t]he *Doyle* rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings." *Hendrix*, 205 F. Supp. 3d at 909 (quoting *Crowder*, 719 F.2d at 172).

But the district court relied on this remark without appreciating that *Crowder* considered *Anderson*'s significance under circumstances far different from those here. In *Crowder*, the defendant received *Miranda* warnings from a Kentucky State Police officer who questioned him at the crime scene, weeks before his arrest. 719 F.2d at 168. When the defendant was arrested weeks later by a federal agent, he told the agent, "in effect, 'I have told my story to the Kentucky State Police and I am sticking to it.'" *Id.* at 171. The court determined that "[t]his was not a claim of the right not to speak, but a reiteration [by the defendant] of his previous story." *Id.* at 170. Accordingly, the court concluded that "[t]here was never any claim of the Fifth Amendment privilege to remain silent." *Id.* at 171. Because this court in *Crowder* concluded that the defendant had never invoked his *Miranda* rights, it had no reason to highlight the nuance in *Anderson* that a defendant may speak with law enforcement about one subject without waiving his right to remain silent about other subjects.

The snippet from *Crowder* that "the *Doyle* rule has no application unless the defendant has remained silent" is therefore unhelpful here because it is incomplete. *See id.* at 172. Taken

out of context, this statement could suggest, as the district court apparently believed, that *Doyle* goes out the window as soon as a defendant makes *any* post-*Miranda* statement.  But that is not the law.  Although *Anderson* stated that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent," it also explained that such a defendant "has not remained silent" only "*[a]s to the subject matter of his statements*."  *Anderson*, 447 U.S. at 408 (emphasis added).  *Doyle* therefore continues to apply to subject matters on which the defendant *has remained silent*.  This is key.  Under *Anderson*, a prosecutor is permitted to probe inconsistencies between a defendant's statements.  But this does not give a prosecutor license to attempt to "draw meaning from silence," which *Doyle* and its progeny strictly forbid.  *Id.* at 409.

Under *Anderson*, the crucial question is whether the prosecutor's comments at trial were "designed to draw meaning from silence," which is constitutionally prohibited, or whether they sought to "elicit an explanation for the prior inconsistent statement," which is permissible.  *Id.* at 409; *see also United States v. Caruto*, 532 F.3d 822, 830 (9th Cir. 2008) ("[T]he primary inquiry in cases where a defendant waives his or her *Miranda* rights is whether the prosecutor's question or argument is 'designed to draw meaning from silence' or instead merely 'to elicit an explanation for a prior inconsistent statement.'" (quoting *Anderson*, 447 U.S. at 409)).  Accordingly, "even if a defendant has made statements to the police after receiving *Miranda* warnings, he is deemed to have maintained his silence, unless the post-arrest statements are inconsistent with the defendant's testimony at trial."  *United States v. Casamento*, 887 F.2d 1141, 1179 (2d Cir. 1989).

The Ninth Circuit's decision in *Caruto* clearly illustrates the distinction between exploring prior inconsistent statements and inviting the jury to derive meaning from the defendant's silence.  In *Caruto*, the defendant was arrested for importing cocaine, which had been concealed in the gas tank of her pickup truck.  532 F.3d at 824.  The defendant briefly spoke with federal agents at the time of her arrest, but she then invoked her *Miranda* rights, cutting the interview short.  *Id.*  At trial, the defendant testified to facts that she had not previously divulged.  *Id.*  The prosecution, on cross-examination, sought to impeach her based on "what she did not say" in her initial interview.  *Id.* at 830.  This put the defendant in a bind because she "could not fully explain why her post-arrest statement was not as detailed as her

testimony at trial without disclosing that she had invoked her *Miranda* rights." *Id.* Moreover, the prosecution's closing argument focused on the defendant's "failure to explain further what had happened" at the time of her arrest, emphasizing all that she "didn't say." *Id.* at 826–27, 830. These comments, the court concluded, "invited the jury to draw meaning from silence"— precisely "the type of penalty for exercising one's Fifth Amendment rights that *Doyle* prohibits." *Id.* at 830–31.

This court found a *Doyle* violation under similar circumstances in *Gravley v. Mills*, 87 F.3d 779, 786 (6th Cir. 1996). Gravley was charged with burglary and sexual assault. *Id.* at 783–84. Shortly after his arrest, Gravley told a detective "that he had never seen [the victim] before she identified him" outside her apartment. *Id.* at 783. Gravley declined to be interviewed, however, when the same detective approached him again four days later. *Id.* During the prosecution's case in chief, it introduced evidence of Gravley's initial statement and of his subsequent silence. *Id.* at 787–88. When Gravley later took the stand, he testified that the victim had willingly admitted him into her apartment and that they had engaged in consensual sex. *Id.* at 783. He further testified that he did not provide this account during his initial interview because he had been "tired, scared and hung over." *Id.* at 784. When cross-examining Gravley, the prosecutor "made references to the fact that Gravley had remained silent on various occasions after his arrest." *Id.* at 787. The prosecutor also "returned to the subject of Gravley's post-*Miranda* silence in his final argument." *Id.* at 788.

On appeal, Gravley argued that the prosecution's references to his post-*Miranda* silence violated his due-process rights. This court agreed. *Id.* at 787. It determined that the prosecutor "first erred when he introduced into the state's case in chief, prior to any testimony from Gravley, substantive evidence that Gravley chose to remain silent on the second occasion that he was interrogated by police." *Id.* The court also concluded that "the prosecutor's cross-examination of Gravley went far beyond calling the jury's attention to [any] inconsistency" in the defendant's statements, and that the prosecutor's statements in closing argument were likewise improper. *Id.* at 787–88. From the prosecutor's conduct, the court inferred that his "clear intent was to persuade the jury that if Gravley's trial testimony had indeed been true, he would have come forward earlier with his story." *Id.* at 787. The court therefore concluded that,

by "repeatedly driving home references to Gravley's silence and implying that such silence was evidence that Gravley was lying," "the prosecutor crossed the line" and struck "a 'foul' blow that amounted to blatant and egregious *Doyle* error." *Id.* at 788–89 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The conduct of the prosecutor in the present case was just as violative of *Doyle*. During the State's case in chief, the prosecutor repeatedly invited Detective Hogan to comment on Hendrix's silence:

> Q Now, as a detective, would you expect such a suspect knowing that the victim might die, to explain how he gained possession of the vehicle, if he's not the thief?
>
> A Okay. If he's not the thief, yes.
>
> Q Why would you expect him to tell you how he gained the vehicle if he's not the thief?
>
> A If he's not the thief, then he's not the one that pushed the woman out of the car, he doesn't want to be blamed for the assault.
>
> Q Do you find it noteworthy in any way that he refused to tell you where he was on September 5, 2006, at 6:45 p.m. or thereabouts?
>
> A Yes.
>
> Q Why is it noteworthy?
>
> A Because I think he's afraid to admit that he's the one that actually pushed Mrs. Doen out of the vehicle.

These questions invited Detective Hogan to derive meaning from Hendrix's silence for the purpose of encouraging the jury to do the same. The prosecutor then elicited from Detective Hogan a tedious account of all that Hendrix did not say, making the prosecutor's improper intent even more obvious:

> Q But, in a more general sense, if he had an alibi, somebody who could say he was with me at a restaurant and here are the receipts, would you expect him to tell you that?
>
> A Yes. He would want me to know that.
>
> Q If he had been with his mother, grandmother, would you expect him to tell you that?
>
> A I would expect that.

Q     So, what does it tell you as a detective that he didn't give you any information about his whereabouts at the time of the carjacking?

A     He does not want me to know where he was.

Q     Now, sir, did he explain to you how he gained possession of the Caravan?

A     No.

Q     Did he say he bought it from a crack addict?

A     No.

Q     Did he say he found it abandoned on the street?

A     No.

Q     Did he say he found it abandoned on a highway?

A     No.

Q     Did he say it was a gift?

A     No.

Q     Any explanation other than being the thief?

A     No.

Q     If he's not the thief, would you expect him to tell you that?

A     Yes.

Q     Why?

A     If he's not the thief, he's not going to want to be charged with a crime of that type of nature.

In his closing argument, the prosecutor again returned to the theme of Hendrix's silence, repeatedly and explicitly inviting the jury to find it inculpatory:

> There is no doubt in this world that if [Hendrix] had an explanation for where he was at that time, on that day, we would know it. He would have told Sergeant Ferguson, and if not Sergeant Ferguson, he would have told Detective Hogan. When he can't tell where he is, what does that mean?

And again:

> If you're not the person who took the car at Vineyards, you're going to be clambering [sic], be wailing. Detective, let me tell you what happened. This is how I got the car, Detective. I didn't want to say anything before, but here's how it happened. Never. Not one word. He says, oh, I don't want to say anymore, because it will get me into trouble.

And still again:

> [T]he Defendant had an opportunity to tell us what happened on September 6 and September 8 and he didn't. His silence is defining, his silence speaks a thousand words. His silence in refusing to say from where he made the call, how he obtained the vehicle, and who he was with during the important times. That's like a thunderbolt from the sky. In other words, he's saying, I did it.

These remarks plainly invited the jury to infer Hendrix's guilt from his silence. The State's attempt to recharacterize them as somehow not relating to Hendrix's silence is totally disingenuous. Collectively, the prosecutor's questions when examining Detective Hogan and his remarks during closing argument reflect an intent to encourage the jury to derive meaning from Hendrix's silence, all in violation of *Anderson*. *See* 447 U.S. at 409. This misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Michigan appellate courts' rejection of this claim is contrary to clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). Hendrix is therefore entitled to relief on the basis of his *Doyle* claim.

## G.     The evidence presented at trial was sufficient to support Hendrix's conviction.

We now turn to the sufficiency of the evidence presented at trial. This issue is critical because, in order for Hendrix to be retried, the evidence presented must have been sufficient to support his conviction. *See Burks v. United States*, 437 U.S. 1, 18 (1978) ("[W]e hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient . . . ."). Hendrix specifically challenges the sufficiency of the evidence presented to identify him as the carjacker.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, an appellate court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Another layer of deference applies, moreover, in the habeas context. *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010). After assessing whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt, the court "must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (emphasis in original). State courts are afforded "considerable leeway" in their sufficiency analyses. *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011).

An additional wrinkle concerns the role of erroneously admitted evidence in the sufficiency-of-the-evidence calculus—here, Hendrix's September 8 statements. A reviewing court "may consider the erroneously admitted testimony, as well as the properly admitted evidence, in reviewing the sufficiency of the evidence." *United States v. Quinn*, 901 F.2d 522, 530 (6th Cir. 1990) (citing *Lockhart v. Nelson*, 488 U.S. 33 (1988)). This is because "[i]t is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial, or what theory the government might have pursued had the evidence before the jury been different," and because "[i]t would prolong trials unduly to adopt a rule that would require the government to introduce all available evidence and assert every possible legal theory in anticipation of reversal of trial court rulings admitting evidence." *Id.* at 531 (quoting *United States v. Harmon*, 632 F.2d 812, 814 (9th Cir. 1980) (per curiam)).

In the present case, the Michigan Court of Appeals reasonably held that a rational factfinder could have found Hendrix guilty beyond a reasonable doubt. Perhaps most probative of Hendrix's guilt are the similarities between the carjacking of Gina Doen's Dodge Caravan and several prior vehicle thefts that Hendrix is known to have committed. These similarities include the area and method of the carjacking; the fact that Hendrix had previously stolen a pickup truck even as its owner clung to a door before being thrown off onto the pavement; the fact that Hendrix was found sitting in the Caravan in the same Detroit neighborhood, far from his residence, to which he had recently driven two other stolen vehicles; and the testimony that drug addiction could explain Hendrix's modus operandi.

All of this evidence supports the conclusion that Hendrix was the carjacker in this case. Hendrix's implausible statement on September 6 that he did not know how he acquired the

Caravan, and his continued refusal on September 8 to explain how he acquired it, even after being told that a woman had been critically injured during its theft, further support the conclusion that Hendrix committed the carjacking. (Of course, Hendrix's September 8 statements were improperly admitted, *see supra* at 12–13, but, as noted above, they may still be considered for sufficiency purposes.) The Michigan Court of Appeals' decision that the evidence was sufficient to support Hendrix's conviction was therefore not unreasonable, as the district court correctly held. *See* 28 U.S.C. § 2254(d)(1).

Sufficient evidence to convict, of course, does not excuse the constitutional violations set forth above. *See Quinn*, 901 F.2d at 531–32 (reversing the defendant's conviction and remanding for a new trial where the evidence was sufficient to support the defendant's conviction, but the proceedings had been tainted by a violation of the Confrontation Clause). But because Hendrix's conviction is supported by sufficient evidence, he may be retried.

## III. CONCLUSION

For all of the reasons set forth above, we (1) **AFFIRM** the judgment of the district court granting Hendrix habeas relief based on his Fifth and Sixth Amendment claims; (2) **REVERSE** the district court's denial of Hendrix's *Doyle* claim; and (3) **AFFIRM** the holding of the district court that the evidence was sufficient to support Hendrix's conviction. Hendrix is therefore entitled to the habeas relief granted by the district court, but the State is entitled to retry him if it so desires, subject to the time constraint imposed by the district court.