NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0382n.06

No. 21-1711

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 16, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RALPH COTTENHAM, | ) | |
| Petitioner - Appellant, | ) ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) ) | THE EASTERN DISTRICT OF |
| NOAH NAGY, Warden, | ) | MICHIGAN |
| | ) | |
| Respondent - Appellee. | ) | OPINION |

Before: BOGGS, WHITE, and BUSH, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Petitioner-Appellant Ralph Cottenham, a Michigan prisoner convicted of the second-degree murder of his step-daughter, Amber Morris, appeals the denial of his petition for writ of habeas corpus, arguing that the state trial court violated his Sixth Amendment rights under the United States Constitution when it barred certain testimony at trial. We AFFIRM.

**I.**

**A.**

When Cottenham's wife, Charlene Morris, died in 2014, he remained close with her daughters, Amber and Holly Morris. In January 2016, Cottenham's estranged 23-year-old son, Cody Sweet, moved into Cottenham's home. Sometime in the evening of April 28, 2016, Amber Morris was killed by a combination of drug intoxication and asphyxia. Sweet testified at Cottenham's trial that Cottenham had murdered Morris and that he had directed Sweet to assist

him in disposing of her body. Cottenham was convicted and appealed to the Michigan Court of Appeals.

The Michigan Court of Appeals set forth the following facts, which the parties agree are "presumed correct pursuant to 28 U.S.C. § 2254(e)(1)." Appellant Br. at 3.

> [Cottenham's] conviction arose from the April 28, 2016 killing of his stepdaughter, Amber Morris. Amber's sister, Holly Morris, testified that she and Amber remained friends with [Cottenham] after their mother died in October 2014. Holly testified that Amber and [Cottenham] worked together and that [Cottenham] would give Amber prescription drugs. Brandon Thomas, Amber's fiancé, agreed that Amber used prescription drugs such as tramadol, that she was addicted to prescription drugs, and that [Cottenham] would give her money and prescription drugs. Thomas stated that [Cottenham] wanted Amber "to come around all the time" and would "bribe" her with money to spend time with him.
>
> The prosecution's primary witness was Cody Sweet, [Cottenham's] son. Sweet had been estranged from [Cottenham] for most of his life, but began living with [Cottenham] in January 2016, having met him only once before. Sweet testified that [Cottenham] wanted a "sexual relationship" with Amber. Similarly, Holly described an incident, "about 45 days before [her] sister died," in which [Cottenham] "was texting [Amber], asking me, is this enough money to ask her for oral sex?" Holly testified that she once took [Cottenham's] phone away from him because he was excessively texting Amber. Holly also recalled a time when [Cottenham] was upset with Amber and said, "I'll kill that b***h." Holly said that [Cottenham] apologized the next day and blamed the statement on being drunk. At trial, Sergeant Matthew Gerow of the Saginaw Police Department recited a series of text messages between [Cottenham] and Amber that began on March 29, 2016. In those messages, [Cottenham] offered Amber money in exchange for sexual favors and told her that their relationship would end if she declined. In her responses, Amber adamantly and repeatedly declined the offers.
>
> On the afternoon of April 28, 2016, Sweet returned home from work and found Amber and [Cottenham] drinking alcohol in the living room. Sweet took a nap until the evening; when he awoke, Sweet observed that Amber and [Cottenham] were arguing, which he testified was not unusual. Sweet said that after Amber left

the home, [Cottenham] called 9-1-1 in an attempt "to get her arrested for a DUI." According to Sweet, [Cottenham] said he was "tired" of "the way she was treating him." Later that evening, [Cottenham] told Sweet that Amber would be returning to the house that night. Sweet testified that [Cottenham] said he was "going to kill her," but Sweet assumed that he was joking. When Amber returned, she and [Cottenham] conversed in the living room while Sweet was in his bedroom. Sweet heard [Cottenham] tell Amber that "he had to show her something in the basement." Sweet said that after [Cottenham] and Amber went to the basement, he heard "a little bit of argument, commotion." Specifically, Sweet thought that Amber might have said "help," but he stated that he "didn't want to get involved." The noise ceased, and about 10 minutes later [Cottenham] entered Sweet's bedroom and told him that he had killed Amber. Sweet rushed downstairs and observed Amber lying face-down on the floor. Sweet said that [Cottenham] proceeded to "kick" and "stomp" on Amber to prove that she was deceased. [Cottenham] then pulled Amber's pants and underwear down and digitally penetrated her. Sweet asked [Cottenham] to stop; he did so after "30 seconds to a minute." Sweet also testified that he observed a "ratchet strap" wrapped around Amber's neck; he stated that [Cottenham] told him that he had "tried knocking her out" but then used the strap to "choke her." Sweet then helped [Cottenham] move Amber's body to the trunk of her vehicle. Sweet said that he helped [Cottenham] out of fear for his life. [Cottenham] then proceeded to clean up the basement with towels and bleach. [Cottenham] instructed Sweet to meet him at a bar and then left in Amber's vehicle. Sweet picked [Cottenham] up from that location, leaving Amber's vehicle there.

The police found Amber's body in the trunk of the vehicle the next day. Within a couple of days, [Cottenham] invited Holly to his house. Holly thought it was unusual that they were "chilling" outside on the patio because they usually "hang out in the house." When Holly later entered [Cottenham's] bathroom, she observed a strong odor of bleach. She also noticed that the basement windows were open, which also was unusual. She testified that at one point [Cottenham] asked her, "[Y]ou don't think I did anything to your sister, do you?"

Dr. Kanu Virani performed Amber's autopsy. He testified that toxicology testing revealed that alcohol and tramadol were in

3

her system when she died, and opined that the cause of death was "a combination of drug intoxication and asphyxia." Dr. Virani could not say whether asphyxiation or drug intoxication was the sole cause of death. Dr. Virani said that the level of tramadol in Amber's system was "in a toxic range," but explained that there is not a "defined overdose" for the drug because a person can develop a tolerance to it. Dr. Virani said that there was "faint bruising" on Amber's face and both sides of her neck. He opined that the markings on Amber's neck were inconsistent "with any string or belt" and indicated that they were consistent with a human hand. Dr. Virani concluded that the manner of Amber's death was a homicide because of "asphyxia and the bruising on the face and the neck."

Sweet testified that he stopped residing at defendant's home within a few days after [Cottenham] killed Amber. Through his attorney, Sweet contacted Sergeant Gerow and disclosed [Cottenham's] crime. Sweet was granted immunity from prosecution, and [Cottenham] was charged with open murder. The prosecution's theory was that [Cottenham] had strangled Amber with his hands and then used the ratchet strap "just to make sure he finished the job . . . ." [Cottenham's] theory of the case was that Sweet had killed Amber out of jealousy for [Cottenham's] attention.

R.9-11, PID 457-59.

Several additional facts are pertinent to our resolution of Cottenham's appeal. First, Sweet minimized his role in cleaning up Cottenham's home and disposing of Amber's body when testifying at Cottenham's preliminary examination, and then told a fuller story of his participation in the clean-up at trial. Cottenham's counsel cross-examined Sweet about this inconsistency and Sweet agreed that he had "commit[ed] perjury, essentially." R.9-6, PID 267. Second, the government introduced Sweet's immunity agreement into evidence and Cottenham's counsel cross-examined Sweet about that agreement extensively. Third, and most significantly, Cottenham's counsel, the prosecutor, and the trial court had an extended discussion about a "preliminary ruling" of the trial court.

4

Following the testimony of Sergeant Gerow on the third day of trial, the trial court excused the jury for the day. The prosecution, Cottenham's counsel and the trial judge then discussed how the remaining witnesses would be presented:

> MR. FREY [Defense Counsel]: . . . The only thing I would make mention is . . . that based on a preliminary ruling of the Court in regards to certain evidence. I'll put on what I believe should be allowed in. The Court has preliminarily told me it's not going to allow that testimony.
>
> So based on that preliminary ruling, which is not on the record, it was done in chambers, I will only be calling two witnesses, and they'll be very brief.
>
> THE COURT: Well, since you brought that up, we should put it on the record now, so that if someone has a chance to look at this later, they're not going to say, what was he talking about?

R.9-7, PID 360.

Defense counsel explained:

> Okay. Just very briefly, then, Judge, we have discussed the defense's theory of the case. We believe there is [sic] certain other pieces of evidence that would relate to [the] motive of Cody Sweet in the homicide of Amber Morris.
>
> Those issues involve proof of motive, and potential character trait or character evidence of Mr. Sweet after explaining the motions and the legal theories behind the request to do that, the Court has indicated it's not inclined to allow that.

*Id.* at 360-61. Cottenham's counsel explained that he intended to produce evidence that Sweet had a motive "[t]o kill Amber Morris" and the trial court responded that Sweet was "not on trial." *Id.* at 361. The trial court asked, "how are you going to show the character traits of Mr. Sweet?" and Cottenham's counsel answered "[w]e would have to call in witnesses who would testify as to his jealous nature." *Id.* Cottenham's counsel proffered that Sweet's ex-girlfriends Virginia Reinhardt and Morgan Bosch would testify that Sweet was "a jealous person" and that he had attacked both of them when he believed they had sex with other men. *Id.* at 361-62.

Cottenham's counsel also intended to put on evidence related to Sweet's criminal

background:

> MR. FREY: Ms. Bosch would've testified [that at] the time Amber Morris was killed, Cody Sweet was on felony bond for charges out of Bay County relating to an—I wasn't going to get into the specifics, but he was on felony bond for a charge of assaulting Ms. Bosch. The essential report read kidnapping and strangulation . . . .
>
> THE COURT: Why is that relevant, Mr. Frey?
>
> MR. FREY: Well, it is relevant because he offers the fact that Amber makes a derogatory statement or some negative comment about him, and he says that his father believes that she's going to try and put him away as [Sweet's] ex, which the ex he's referring to is Ms. Bosch, is trying to put him away. It would explain what that's— the context of that statement.
>
> THE COURT: But how would that fact that he was on bond for an assault show [that]? What does it show?
>
> . . .
>
> MR. FREY: Well, we would argue it creates a panic in Mr. Sweet, that he's already on charges for one assault, because we believe the evidence has shown through Cody's testimony, Ms. Amber Morris was struck in the head. And he's testified, if I recall correctly, that it wasn't until she wouldn't go down . . . that the strangulation part of the assault began.
>
> THE COURT. Okay. So are you trying to show that he has a propensity to do that and had acted in conformity therewith?
>
> MR. FREY: No.
>
> THE COURT: Okay. Why were you trying to show that he's on bond for assault.
>
> MR. FREY: I'm trying to show it that he might have panicked and not wanted a second case on him.

*Id.* at 362. The trial court responded that it would not put "that gobbledygook in front of [the

jury]. That doesn't make any sense whatsoever. If you're trying to show—you keep trying to

skirt acted in conformity therewith, but that's what you're arguing, that he panicked and struck

her because he didn't want another case." *Id.*

The jury found Cottenham guilty of second-degree murder and he was sentenced to 60-to-90 years of imprisonment.

**B.**

Cottenham appealed his conviction to the Michigan Court of Appeals. He argued that there was insufficient evidence to support his conviction, that his right to present a defense was violated, and that the trial court erred by failing to give a particular jury instruction.

With respect to his right to present a defense, Cottenham argued that "his right to confront his accuser" was denied "when he was prevented from cross-examining Cody Sweet about his jealous nature, violent tendencies, and the motivations to pin this offense on Mr. Cottenham." R.9-11, PID 501. Cottenham characterized this as both an evidentiary and a constitutional issue. He explained that "[t]his Court reviews the trial court's decision whether to admit evidence for an abuse of discretion" but that "[t]he constitutional question of whether a defendant was denied the constitutional right to confront a witness is [] reviewed de novo." R.9-11, PID 500. Cottenham's briefing acknowledged that the evidentiary question and the constitutional question overlapped but argued that they were separate inquiries.

The Michigan Court of Appeals concluded that Cottenham had "effectively abandoned this issue by failing to support it with relevant legal authority." *Id.* at 461. The court determined that, although Cottenham "cite[d] caselaw regarding his constitutional right to confront the witnesses *against* him,":

> The proffered testimony at issue pertained not to witnesses against defendant, but rather to witnesses whom defendant intended to call on his own behalf. Specifically, defendant was seeking to introduce testimony from Sweet's former girlfriends to show that Sweet was a jealous person. Therefore, the caselaw relied on by defendant is inapposite.

7

*Id.* On the merits, the Michigan Court of Appeals analyzed the issue strictly as an evidentiary challenge and explained that the proffered testimony was "irrelevant to Sweet's purported motive to commit the crime." *Id.* at 462. The court reasoned that Sweet's ex-girlfriends would have testified that Sweet had attacked them "because he was jealous of their romantic relationships with other men" but "Amber was not Sweet's girlfriend or former girlfriend, and defendant's theory was not that Sweet had killed Amber because he was jealous of her having any other romantic relationships . . . [but] of Amber's paternal relationship with defendant." *Id.* The court further explained that even if the evidence was marginally relevant, its probative value was substantially outweighed by the danger of unfair prejudice to Sweet. *Id.* Accordingly, the Michigan Court of Appeals rejected Cottenham's challenge. Cottenham's application for leave to appeal to the Michigan Supreme Court was denied.

Cottenham petitioned the United States District Court for the Eastern District of Michigan pro se for a writ of habeas corpus. He sought relief on seven grounds, including that his "right to present a defense was violated when the trial court would not allow questioning of Mr. Cottenham's accuser to show bias and/or motive in his story." R.11, PID 663. Cottenham's petition was held in abeyance so he could return to state court and exhaust additional claims. Cottenham moved for relief from judgment on the unexhausted claims in state court. That motion was denied, as were his subsequent appeals to the Michigan Court of Appeals and the Michigan Supreme Court.

When Cottenham returned to the district court, he added three additional claims to his petition. The district court denied Cottenham's petition with prejudice. With respect to the claim that Cottenham was "denied the right to present a defense," the district court agreed with the Michigan Court of Appeals that the claim had been procedurally defaulted because Cottenham had

"failed to cite any relevant legal authority to support his claim." R.22, PID 936. The district court also declined to grant a certificate of appealability.

Cottenham appealed the denial of his petition and we granted "a certificate of appealability as to Cottenham's claim regarding the [trial] court's limitation of Sweet's cross-examination," and appointed counsel. *Id.*

## II.

Cottenham raises two issues for this court's review: first, that the Michigan Court of Appeals misconstrued his Sixth Amendment claim as solely an evidentiary claim and, therefore, the district court's finding of procedural default was based on an inapplicable procedural rule; second, that the state trial court violated his Sixth Amendment rights by barring certain testimony.

## A.

We review the denial of habeas corpus relief under 28 U.S.C. § 2254 de novo. *Bronaugh v. Ohio*, 235 F.3d 280, 282 (6th Cir. 2000). Where a claim has been adjudicated on the merits by a state court, that claim is reviewed under the highly deferential standard of the Antiterrorism and Effective Death Penalty Act (AEDPA). *Hendrix v. Palmer*, 893 F.3d 906, 917 (6th Cir. 2018). Under that standard, a petitioner can obtain relief only if the state-court decision was either:

> (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Cottenham argues that "here, the state court fail[ed] to adjudicate the habeas petitioner's federal constitutional claim 'on the merits'" and AEDPA deference is inapplicable. Appellant Br. at 15 (citing *Brown v. Romanowski*, 845 F.3d 703, 711 (6th Cir. 2017)).

9

There is a "rebuttable presumption that a state court has reached the merits of a petitioner's federal claims." *Brown*, 845 F.3d at 711 (citing *Harrington v. Richter*, 526 U.S. 86, 99 (2011)). The presumption of adjudication "is a strong one that may be rebutted only in unusual circumstances" but is nonetheless "not irrebuttable." *Johnson v. Williams*, 568 U.S. 289, 302 (2013). Accordingly, a judgment is adjudicated "'on the merits' only if it was 'delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1199 (9th ed. 2009)). This court has explained that the presumption of adjudication may not apply where the reviewing state court "misconstrued" the petitioner's argument and accordingly "did not reach the core" of that argument. *Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012). In *Campbell*, this court determined that de novo review—rather than AEDPA review—was appropriate when the Ohio Supreme Court reviewed a claim that a trial court had failed to give an instruction on voluntary intoxication rather than petitioner's broader claim "that the trial court effectively prevented him from arguing voluntary intoxication—not that the trial court merely failed to give him an instruction on voluntary intoxication." *Id.* To determine what the state court "adjudicated," this court reviews "the language used by the state court in its discussion of the claim at issue and the context of that discussion when the state court's opinion is 'read as a whole.'" *Barton v. Warden*, 786 F.3d 450, 460 (per curiam) (quoting *McCarley v. Kelly*, 759 F.3d 535, 543-44 (6th Cir. 2014), *vacated on other grounds*, 576 U.S. 1054 (2015)).

Cottenham argues that his briefing before the Michigan Court of Appeals "clearly and fairly presented a claim that his 'right to present a defense was violated when the trial court would not allow questioning of [his] accuser to show bias and/or motive.'" Appellant Br. at 16. He asserts that this argument was "[f]rom the outset" framed "as a *federal constitutional* question under the Sixth Amendment." *Id*. An independent review of Cottenham's brief before the

10

Michigan Court of Appeals confirms that Cottenham described the trial court's error as having "violated" his "right to present a defense." R.9-11, PID 500. And Cottenham stated in that brief that there were both evidentiary and constitutional aspects to this claim, and he laid out the standards of review for both the constitutional and evidentiary issues.

In its finding that Cottenham had "cite[d] caselaw regarding his constitutional right to confront witnesses *against* him" but not case law with respect to a complete-defense claim, the Michigan Court of Appeals ignored the overlap between those claims and failed to address Cottenham's claim on the merits. R.9-11, PID 461. We have acknowledged that the Constitutional right to present a complete defense has multiple origins: "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Couturier v. Vasbinder*, 385 F. App'x 509, 516 (6th Cir. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). The blurred line between where Cottenham's Confrontation Clause rights end (i.e., Cottenham's right to confront Sweet with his behavior toward other women in his life) and his complete-defense right begins (i.e., Cottenham's right to call witnesses in his defense to establish Sweet as a potential alternate suspect) makes it difficult to conclude that the limited discussion of Cottenham's constitutional argument by the Michigan Court of Appeals was an adjudication on the merits.

In any event, because Cottenham's claim fails even under de novo review, we will review under that more searching standard.

11

**B.**

Cottenham argues that his habeas claim was not procedurally defaulted.  A federal habeas claim is procedurally defaulted when

> 1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; 2) the state courts actually enforced the procedural rule in the petitioner's case; and 3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim.

*See* Appellant Br. at 36-37 and Appellee Br. at 38-39 (both citing *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006)).

The Michigan Court of Appeals determined that Cottenham had "effectively abandoned" his constitutional claim because he had "fail[ed] to support it with relevant legal authority."  R.9-11, PID 461.  The district court explained that "[u]nder Michigan law, 'an appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority."  R.22, PID 936 (alteration in original) (quoting *People v. Matuszak*, 687 N.W.2d 342 (Mich. Ct. App. 2004)).  The district court concluded that "[a] state court conclusion that an issue was waived is considered a procedural default."  *Id.*

Cottenham argues that his claim of error on direct appeal related to the right to present a defense and he explained that this issue was distinct from any underlying evidentiary issue.  Admittedly, Cottenham's briefing on this issue makes references to a failure by the trial court to permit him full cross-examination of Sweet.  But Cottenham clearly explained that his constitutional right to present a defense was violated when he was prevented from presenting testimony from Sweet's ex-girlfriends—and he supported that argument with case law from the Supreme Court of the United States.  *See* R.9-11, PID 501 (citing *Washington v. Texas*, 388 U.S.

12

14, 23 (1967) (holding that a defendant was "denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense. The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use."))[1]

Thus, Cottenham did cite case law in support of his claim that his right to a defense and his rights under the Confrontation Clause were violated by the trial court's order. Those arguments may not have been strong and the case law may not have been entirely on point, but Cottenham's briefing was not so deficient that the Michigan Court of Appeals had to "discover and rationalize the basis for his claims" on its own. *Matuszak*, 687 N.W.2d at 353. And Cottenham's briefing did not give the right-to-a-defense issue "[s]uch cursory treatment [as to] constitute[] abandonment of the issue." *Id.* Because Cottenham's briefing was sufficient to permit the Michigan Court of Appeals to render judgment on the merits of Cottenham's Sixth Amendment claims, we find that his claims were not procedurally defaulted.

## C.

Cottenham's Confrontation Clause claim appears to be that the trial court limited his counsel's cross-examination of Sweet and that when the trial court "imposed a blanket restriction on certain witnesses and large swaths of testimony," it effectively "insulat[ed] Mr. Sweet from effective cross-examination." Appellant Br. at 25. He argues that the "Confrontation Clause['s]

---

[1] Many of the cases that Cottenham cited in his briefing before the Michigan Court of Appeals can be distinguished on the facts or on the law, but the fact remains that Cottenham cited precedent that was colorably applicable to his underlying constitutional claim, and the Michigan Court of Appeals never addressed the substantive merits of his constitutional argument.

protections include a right to impeach witnesses with their criminal history" and that the trial court's ruling precluded Cottenham from introducing evidence of Sweet's prior criminal history and from eliciting testimony about Sweet's "ulterior motive to obtain immunity." *Id.* at 27.

It is true that "the Confrontation Clause affords the right to impeach a witness with his criminal record, subject to the trial court's discretion to impose reasonable limitations to prevent harassment and annoyance of the witness." *Vasquez v. Jones*, 496 F.3d 564, 571 (6th Cir. 2007). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). If the trial court had limited Cottenham's ability to cross-examine Sweet as to bias, motive, or credibility, perhaps Cottenham could raise a Confrontation Clause issue. But this is not what happened.

Cottenham's dispute with the trial court arises from the exchange between his counsel and the court on the third day of trial, after Sweet's direct testimony and cross-examination on the second day of trial. As discussed, the trial court had made an off-the-record ruling regarding Cottenham's counsel's intent to have two of Sweet's ex-girlfriends testify that Sweet was "a jealous person" and that he had attacked each of them when he believed they had sex with other men. R.9-7, PID 360. Cottenham's counsel and the trial court discussed this issue at length when putting the ruling on the record. *Id.*

During the exchange, Cottenham's counsel did not mention any limitation on cross-examination or suggest that he had endeavored to comply with the trial court's unwritten directive by limiting his cross-examination of Sweet on the second day of trial. And when Sweet was cross-examined by Cottenham's counsel, the trial court sustained only one objection. That objection

had nothing to do with Sweet's motive to kill Amber, but instead related to Sweet's communications with his attorney. *Id.* At no point during the cross-examination or during the later exchange between counsel and the trial court did the trial court meaningfully limit Cottenham's counsel's cross-examination of Sweet. And even after the exchange on the third day of trial, Sweet remained on a continuing subpoena and Cottenham's counsel was free to re-call him for additional questioning. *See* R.9-6, PID 286.

Because there was no meaningful limitation of Cottenham's cross-examination of Sweet, there can be no Confrontation Clause issue. *See Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam) (explaining that the Court has "never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes"). Accordingly, Cottenham cannot obtain habeas relief under his Confrontation Clause theory.

**D.**

Cottenham also argues that the trial court violated his right to present a complete defense by limiting the testimony of Bosch and Reinhardt. As discussed above, defense counsel proffered that Bosch and Reinhardt would have testified regarding Sweet's "jealous nature" and that he had physically attacked them.[2] R.9-7, PID 361. Defense counsel also proffered that Bosch would have testified that Sweet was on "felony bond for charges out of Bay County" related to kidnapping and strangling Bosch. *Id.* at 362. Cottenham argues that this evidence would have provided proof of Sweet's motive to kill Amber: he was jealous of the time his father spent with her, and once he attacked her, he did not want to receive another assault charge, so he panicked and killed her.

---

[2] After the trial court's ruling, Cottenham's counsel called Bosch for a limited direct examination. She testified that she briefly dated Sweet and that Sweet provided her with Tramadol. Reinhardt did not testify, but Cottenham's counsel introduced Reinhardt's recorded statement into evidence. That statement is not part of the appellate record.

15

Cottenham argues that the trial court's rulings "prevented him from effectively re-examining Mr. Sweet" and denied his "right to call witnesses." Appellant Br. at 28. The Supreme Court has explained that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). At the same time, however, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). Accordingly, the Supreme Court has "rarely . . . held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Jackson*, 569 U.S. at 509. Those "rare" cases have included state rules that "did not rationally serve any discernible purpose," *id.* (citing *Holmes v. South Carolina*, 547 U.S. 319 (2006)), "arbitrary" rules, *id.* (citing *Rock v. Arkansas*, 483 U.S. 44 (1987)), rules where the "[s]tate did not even attempt to explain the reason for its rule," *id.* (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)), and rules that "could not be rationally defended," *id.* (citing *Washington*, 388 U.S. 14 (1967)). Accordingly,

> [w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury . . . . [T]he Constitution permits judges "to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"

*Holmes*, 547 U.S. at 326-27 (quoting *Crane*, 476 U.S. at 689-90).

Although Cottenham refers to this searching standard, he does not explain how the trial court's evidentiary decisions were so "arbitrary" or irrational as to violate his right to a complete defense. *Jackson*, 569 U.S. at 509. At best, Cottenham argues that

16

> [i]n *Chambers*, when a court used evidentiary rules to deny a defendant both the opportunity to call witnesses *and* cross-examine them regarding the credibility and culpability of a third party, the Supreme Court held that a new trial can be warranted under the 'facts and circumstances' of a case. The same rationale applies here.

Appellant Br. at 28 (citing *Chambers*, 410 U.S. at 302-03). But in *Chambers*, the Court found that "[a]s a consequence of the combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule, [Chambers] was unable either to cross-examine" a witness that he argued was an alternative suspect "or to present witnesses in his own behalf who would have discredited [the alternative suspect's] repudiation [of an earlier confession that he had committed the crime] and demonstrated [the alternative suspect's] complicity." *Chambers*, 410 U.S. at 294. The Court concluded that "[i]n large measure, [Chambers] was thwarted in his attempt to present this portion of his defense by the strict application of certain Mississippi rules of evidence." *Id.* at 289.

The same is not true here. Cottenham successfully cross-examined Sweet, and the trial court's decision to exclude the testimony of Bosch and Reinhardt regarding Sweet's "jealous nature" was a permissible relevancy determination that did not violate his Sixth Amendment rights. The trial court determined that evidence that Sweet "suffers from jealousy" was not relevant to whether "he might have had a motive to commit this crime." R.9-7, PID 362. And the trial court also identified a tension between evidence of "motive" or Sweet's "jealous nature" and evidence that Sweet "acted in conformity therewith." *Id.* at 361. As the Michigan Court of Appeals explained in its discussion of the evidentiary issue, "the proffered testimony was irrelevant to Sweet's purported motive to commit the crime. . . . Amber was not Sweet's girlfriend or former girlfriend, and defendant's theory was not that Sweet had killed Amber because he was jealous of her having any other romantic relationships" but instead, that "Sweet was jealous of Amber's paternal relationship" with Cottenham. R.9-11, PID 462. Although the proffered testimony and

motive both concerned "jealousy," the Michigan Court of Appeals also explained that "even if the evidence was marginally relevant to Sweet's purported motive, its probative value was 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* (quoting Mich. R. Evid. 403).

Further, Cottenham's theory that Sweet killed Amber out of jealousy was presented to the jury through other means. During Sweet's direct examination, the prosecution asked Sweet whether he was "jealous of [Cottenham's] and Amber's relationship." R.9-6, PID 270. On cross-examination, Sweet suggested that Cottenham killed Amber because "he was tired of her stuff . . . she brought my name up and started, I guess, disrespecting me." *Id.* at 276. Sweet made a similar statement during his direct examination, claiming that Cottenham was "just tired of her crap . . . The comments she was making about me, I guess, kind of pushed him over the limit." *Id.* at 265. And during the cross-examination of Sergeant Gerow, Cottenham's counsel played a video clip from Sweet's interview with Gerow. In that clip, Sweet told Gerow that he "didn't feel that [Amber] was worth his father's attention." R.9-7, PID 359. Further, Cottenham's counsel's opening statement analogized the case to the story of Cain and Abel, explaining "[w]e all infer the story is one of jealousy, that Cain is jealous of Abel, and therefore, killed him. This case, I believe, is also about jealousy." R.9-6 at 260. And in his closing argument, Cottenham's counsel revisited the theme, stating "Cain killed Abel because he was jealous, jealous of the relationship or that his father accepted the offering from his brother, his sibling." R.9-9, PID 431. He elaborated,

> [i]n this case, [Cottenham], as the father, has accepted Amber's offer and has not accepted [Sweet's]. Has essentially given all of his blessing to Amber and withheld [Sweet]. Jealousy. Most powerful motive that there is out there. It's present throughout this case.

*Id.* at 434. The motive of jealousy would not have been difficult for the jury to discern, and the trial court did not deprive Cottenham of the right to present this defense.

Although a closer question, the trial court made a permissible relevancy determination and did not violate Cottenham's Sixth Amendment right when it excluded evidence of Sweet being "on felony bond" for assault. The trial court determined that such evidence suggests that Sweet has "an assaultive nature," and explained that the defense could not present the evidence without arguing that Sweet had "acted in conformity with his nature of being assaultive." R.9-7, PID 362-63. Essentially, the trial court concluded that although the evidence may have tended to show that Sweet "panicked" and did not "want a second case," it was more prejudicial than probative. That determination is supported by Michigan evidence rules and their federal analogs (i.e., Fed. R. Evid. 401, 403, and 404). *See Olson v. Little*, 604 F. App'x 387, 394 (6th Cir. 2015) (explaining that "a state rule's mere nonconformity with its federal analogue should not be per se troublesome"). Without showing that those underlying rules are "'arbitrary' or 'disproportionate to the purposes they are designed to serve,'" Cottenham cannot prevail on this argument, either. *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Scheffer*, 523 U.S. at 308).

On our de novo review, we conclude that Cottenham has failed to show a violation of his Sixth Amendment rights and AFFIRM.